793 So.2d 393 (2001)
Colton A. SANDERS and Deborah L. Sanders, Plaintiffs-Appellants,
v.
Larry J. EARNEST, Jr. and Teresa L. Earnest, Defendants-Appellees.
No. 34,656-CA.
Court of Appeal of Louisiana, Second Circuit.
July 24, 2001.
*394 Downer, Kyle & Wilhite by Robert W. Kyle, Shreveport, Counsel for Plaintiffs-Appellants.
John P. Guillory, Lafayette, Counsel for Appellees.
Michael H. Wainwright, Shreveport, Counsel for Defendants-Appellants.
*395 Before GASKINS, CARAWAY and DREW, JJ.
DREW, J.
In this action to rescind their purchase of a home, Colton Allain Sanders and Deborah Lutterman Sanders (plaintiffs) appealed the judgment which awarded them a reduction in the purchase price paid to the sellers, Larry Joe Earnest, Jr. and Teresa Lee Earnest (defendants). The plaintiffs urged that the trial court's remedy was inadequate. The defendants also appealed and asserted the trial court erred in finding a redhibitory defect in the house. For the following reasons, the judgment of the trial court is amended to increase the award for the reduction in the purchase price to $42,500.00. In all other respects, the judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND
On November 15, 1996, the Sanders purchased a home in Southern Hills Subdivision in Shreveport at 9226 Rhett Street from the defendants. The house was built on a hill side. The upper floor containing the main living areas was on the same level as the front yard and driveway in front of the house. The lower portion of the structure containing a large open garage and several store rooms was located under the master bedroom area, kitchen and den. A stairway connected the upper and lower parts of the home.
In a petition filed August 29, 1997, plaintiffs alleged that shortly after they moved in they discovered flooding and water leakage problems in the lower level garage and store rooms along with water seepage through the joints in the garage and the steel beams supporting the kitchen, den and master bedroom above. Plaintiffs asserted that the flooding resulted from hidden defects in the home which they could not reasonably have discovered. Moreover, the plaintiffs alleged they had no knowledge of the problems while the defendants had knowledge of the defects and failed to disclose them prior to the sale. The defendants allegedly concealed the true condition of the home by making superficial cosmetic repairs to hide evidence of water leaks. Plaintiffs asserted that after learning of the defects, they gave notice of the defects which the defendants failed and refused to repair or correct. In their original petition, plaintiffs sought a reduction of the purchase price in an amount necessary to repair and correct the defects along with damages and attorneys fees.
In their answer the defendants, in addition to their denials, stated that the condition was common to below ground structures and was apparent and readily discoverable by inspection. Further, the defendants had no duty to disclose. Defendants acknowledged that they had received plaintiffs' notification to make repairs and that defendants had made no repairs. Further, the defendants urged that plaintiffs' substantial landscaping activities, including excavation of the area around the garage wall, exacerbated the condition and increased the amounts of water seepage so that plaintiffs' own actions were the proximate cause of the condition.
In the first amended petition filed in October 1997, the Sanders named as an additional defendant, Smith and Raley, Inc. (S & R), an engineering firm hired by the Sanders to inspect the property and give them an opinion as to the fitness of the residence prior to their purchase. The Sanders also sought to rescind the sale based on their allegation that the property was unfit to use as a residence and in the alternative, sought a reduction in the purchase price. Alternatively, the Sanders *396 stated, that if the defects were found not hidden, then they sought damages from S & R for negligence in failing to discover the defects, failing to notify the Sanders of the defects and failing to disclose its relationship to the defendants.
The Earnests answered that the Sanders paid a fair price for the house which was below the amount spent on their acquisition and renovations. The Earnests maintained that the price took into account the property condition.
In answer, S & R denied the allegations of the original and amending petitions and liability for damages. S & R asserted that any damages were caused by parties other than defendants and that contributory negligence of plaintiffs was a factor in barring or diminishing damages. S & R also filed a cross-claim requesting that the Earnests be made liable for any damages assessed against S & R. S & R alleged that the Earnests failed to disclose hidden defects and failed to repair the property.
In a second amended petition filed in November 1998, the Sanders added L.J. Earnest, Sr. as a defendant and alleged that Earnest, Sr. acted as general contractor and built the house for his personal residence in 1977. S & R inspected the property on October 23 and 30, 1996, prior to the Sanders' purchase. After the purchase, the Sanders made improvements to the house and moved into the home in February 1997. Shortly after moving in, the Sanders discovered the leakages and became ill from bacteria related causes. The excessive moisture caused the home to be infiltrated by mold, mildew, bacteria and other toxins. Due to flooding, the Sanders had to abandon the property in late 1997 and obtain alternate housing.
All the Earnest defendants filed an exception of vagueness to the Sanders' second amended petition which was denied by the trial court. In their answer to the second amended petition, the Earnests stated that L.J. Earnest, Sr. and his family used the property as their residence while L.J. Earnest, Jr. was growing up. Then L.J. Earnest, Jr. and his wife purchased the property. The Earnests acknowledged knowing the Sanders had hired S & R but denied knowing the scope of S & R's undertaking. The Earnests also denied the existence of any defect that would constitute a redhibitory defect. Further, the Earnests stated that the defect about which the Sanders complained did not exist prior to the sale. Minor moisture problems which pre-existed the sale were apparent from marks visible upon inspection. The Earnests also stated that the pre-sale repairs and painting were completed before the Earnests decided to sell the house. In amended answers, the Earnests sought rental value of the property and pled the affirmative defense of set-off if a judgment rescinding the sale was granted.
In its answer, S & R denied any defects existed, were apparent or were discoverable. In S & R's view, it could not be liable for rescission and urged that, at most, it could only be responsible for the cost to repair the defects, if any were found to have existed. S & R also filed a motion for summary judgment which the trial court denied.

REASONS FOR JUDGMENT
In written reasons, the trial court stated that the preponderance of credible evidence accepted by the court established the following factual findings. Larry Joe Earnest, Jr. and Teresa Lee Earnest owned the Rhett Drive home and began major renovations in 1995 which included repairs, improvements, and painting to the subterranean carport and storage room area. The renovations were completed only months prior to the sale of the home. On October 20, 1996, Colton Allain Sanders *397 and Deborah Lutterman Sanders made an offer to purchase the property which was accepted by the Earnests. Prior to the closing Ron Smith of the engineering firm, S & R, inspected the structural integrity of the home on behalf of the Sanders. Mr. Sanders was present and directed Ron Smith to his areas of concern. On October 24, 1996, Ron Smith issued the Sanders a report indicating there were water stains near the fireplace clean out, and standing water on the floor near the air conditioning duct in the storage room next to the carport. The source and severity of those leaks was not determined prior to the closing. On November 15, 1996, the Sanders purchased the home from the Earnests, Jr. The trial court found there was insufficient evidence to establish the Earnests were aware of the defects in the home which the Sanders later claimed. The Sanders began work on the house which continued until they moved in February 4, 1997. Shortly thereafter, the Sanders noticed increasing amounts of water leaking into the carport storage rooms, and eventually the carport ceiling during heavy rains. The trial court found that rainwater was not being diverted by the current drainage system and leaked through and around the retaining wall surrounding the carport. Finally, the trial court found that $24,500 would be incurred in order to correct the leak(s) based upon testimony by the Sanders' expert who itemized the different tasks in the total.
The trial court made the following conclusions of law:
1. A redhibitory defect existed at the time of the sale and delivery of the home from the Earnests to the Sanders which did not render the house totally useless, but rather diminished the usefulness of the home such that the Sanders still would have bought the home, but for a lessor price;
2. The sellers were in good faith;
3. Plaintiffs did not know nor should they, under the circumstances, have discovered the defects of the home at the time of the sale;
4. The Earnests had timely notice of the defects in the home and did not attempt to make any repairs;
5. There was no negligence in the inspection conducted by Smith and Raley, Inc.
The trial court declined to set aside the sale and concluded that Larry Joe Earnest, Jr. and Teresa Lee Earnest should pay to the Sanders a reduction in the purchase price. The Sanders' demands against Smith & Raley, Inc. were rejected.
On March 31, 2000 the trial court signed a judgment in favor of the Sanders and against the Earnests awarding them a $24,500 reduction in the purchase price, along with all costs of the proceedings except for the costs advanced by third-party defendant, S & R, which were ordered paid by the Sanders. A subsequent judgment rejected the Sanders' claims against L.J. Earnest, Sr., dismissed them with prejudice and directed that plaintiffs pay any advanced costs posted by Earnest, Sr. The Sanders filed a devolutive appeal as did L.J. Earnest, Jr. and Teresa Lee Earnest.

TESTIMONY
Mr. Sanders testified that the couple noticed the "for sale" sign in front of the house and immediately contacted a realtor. The couple spent an hour or two looking at the house. The Sanders liked the house so much that they made an offer of $190,000 that same day (October 20, 1996) for the house. The realtor contacted Earnest, Sr, who countered with the full asking price of $200,000 which the Sanders accepted. As a condition of the sale, the Sanders made *398 arrangements to have the house inspected and obtained a key for that purpose.
Because the house was a split-level of concrete and brick construction, Mr. Sanders stated the house was beyond his capability to make an engineering inspection and he hired Ron Smith of S & R for that purpose. During the inspection which covered the exterior and interior from basement to attic, Smith pointed out a number of concerns, but informed Mr. Sanders that the residence was a good sound house. As a result of the inspection, the Sanders drew up a "punch list" of minor repairs which the Earnests made prior to closing. When the Sanders' mortgage company informed them it would not be ready for the closing by the set date of November 15, the realtor told Mr. Sanders to contact Joey Earnest, Jr., the son of L.J. Earnest, Sr. Earnest, Jr. informed Mr. Sanders they could not delay the closing because his father had made plans for the sale proceeds; Earnest, Sr. was receiving the sale proceeds as repayment for a loan to the Earnests, Jr. used to purchase their new home. The only person Mr. Sanders had seen at the house was Earnest, Sr. whom Mr. Sanders thought was the owner of the house. The sale closed on November 15 at which time the Sanders met the defendants for the first time.
After doing a great deal of work on the house, the Sanders moved in around February 5, 1997. About a week or so after the move, Mr. Sanders went downstairs during a rain. He noted water infiltration along a beam and streams of water coming out of the wall. Mr. Sanders called for Ron Smith of S & R to return to look at the problem. Smith came around the first of March. In a letter placed into evidence, Smith stated he talked to Earnest, Jr. who stated that the house had leaked in the past but only during very wet times of the year. Smith noted that rain had been well above average.
Mr. Sanders testified that Ron Smith told him he did not wish to be adverse to the Earnests, so Mr. Sanders hired Brian Smith, another engineer, to assist him. After receiving Brian Smith's report, the Sanders contacted the Earnests and requested that they fix the problem, but they did not.
About April 15, 1997 the Sanders had landscaping done. They removed large shrubs in front and replaced them. Mr. Sanders stated he made the landscapers aware of the drainage problems and cautioned them to insure that ground water drained away from the house. According to Mr. Sanders, the house leaked every time it rained, a little with a little rain and a lot with a big rain. Mr. Sanders described his efforts at improving the drainage at the house. Mr. Sanders also made videos of the leaks and deterioration in April and December 1997 and in September 1998.
According to Mr. Sanders, Earnest, Sr. told him that the house had been built over a running spring and that a large area of gravel had been placed under the concrete carport floor to assist the drainage system installed by Earnest. Mr. Sanders described a chronic wet spot on the other side of the solid brick fence which appeared to be water coming from underneath the slab.
Mr. Sanders also stated that he developed chronic sore throats, running nose, sinus and nausea and his daughter, who had basically always been very healthy, got cold/flu symptoms. Surmising that the mold might be a factor, Mr. Sanders had the house evaluated by Jones Environmental which expressed concerns about (1) molds and mildews being circulated from the store room return air vent throughout the house and (2) pesticides being carried *399 with the water onto interior concrete, drying, becoming air borne and coming into contact with the Sanders family. Jones Environmental told them to vacate the house or fix the problem. When Sanders had previously attempted to correct the problem, he stated the Earnests had accused him of exaggerating the problem. After consulting with his physician brother, the Sanders moved out. After they vacated the home, his daughter's health improved with medical treatment. Testing determined that Mr. Sanders had a bacterial infection that was treated with antibiotics. Although the house was treated right before the purchase, Mr. Sanders said that termite infestations continued every spring. Mr. Sanders stated there was no way he would have purchased the house had its condition been disclosed to him prior to the purchase.
On cross-examination Mr. Sanders admitted that weather records for the Shreveport airport showed 10.81 inches of rain over 17 days between the November 15 closing and the February 5 date the Sanders family moved in. Mr. Sanders acknowledged that he and his wife were at the house daily during that period to meet inspectors and contractors for work being done. They noticed no leaking during that period. Prior to the landscape work, the Sanders installed a flex pipe to divert water that came through the down spouts into the front flower beds. Sanders did not install the recommended French drain and mira drain board because he wanted an overall plan to stop the water problem. Sanders had no explanation of where the water went from the time the Earnests' remodeling had been finished in December 1995 until he inspected it in October 1996 and found the carport to be in pristine condition. Further, the plaintiff acknowledged that no doctor had attributed directly his or his daughter's illnesses to mold and mildew.
Dan Graff, a consulting engineer, testified he was contacted by defense counsel and asked to inspect the house in September 1997. He saw evidence of water infiltration in the lower level and concluded it was caused by rapid accumulation of ground water during wet weather and inadequate drainage outside the retaining walls. Graff stated he did not see a drainage system and that if one had been installed, it was not working. Graff saw no evident structural problems with the house.
Trey Thomas, a carpenter working for the Sanders, noticed the water infiltration and dripping in January 1997. He put a can in the carport to catch water to keep it off his saw and wood.
Gary Green, accepted as an expert in industrial hygiene with experience in environmental site assessments, did a visual evaluation of the home in January 1998. Based upon the amount of mold and mildew and concerns about possible pesticide contaminated soil and water leaching from the house, Green opined it was unsafe to live in the house. Green noted that the return air vent in the downstairs store room had the potential to recirculate mold and mildew throughout the house. Green acknowledged he had done no testing so the concerns he expressed were only possibilities.
Lois Bluhm lived across the street from the Earnests and later the Sanders. She had given an affidavit stating in the spring of 1995 the Earnests did some remodeling and dug up a portion of their front yard for a trench in which they put a drain pipe. The affidavit also stated that Terry Earnest told her they had water problems and had to replace some boards because the water did not drain properly. At the trial, Mrs. Bluhm did not remember and was uncomfortable testifying. She stated that *400 Terry Earnest had called her to say she did not recall that conversation.
Larry Earnest Sr. testified that he acted as general contractor and constructed the home for his personal use. Employees of L.J. Earnest, Inc., his road construction company, built the home and the company paid for the materials. The foundation system included a concrete slab and retaining wall as well as creosote pilings every ten feet around the 12 inch retaining wall. A waterproof barrier was installed to prevent water coming through the retaining wall and a drainage system was placed at the base of the retaining wall. The drainage system connected to a gravel bed under the carport which was built over a running spring. A PVC pipe carried the water from the gravel bed to the driveway and on to the back of the property. Earnest Sr. testified the pipe terminated at a ditch at the northwest corner of the property. Neighbors periodically questioned whether sewerage was draining from the pipe. Earnest, Sr. also noted that PVC pipe deteriorated over time and was not a lifetime installation. The witness also stated that the drainage pipe could become blocked over time.
Instead of installing a garage door during the 1995 remodeling, a second false ceiling was placed in the garage to cure a problem of cold floor in the master bedroom above the garage. Earnest Sr. also described an 18 inch concrete pipe from a catch basin that collected and drained water from concrete surfaces into the ditch.
Earnest Sr. stated that he signed the listing agreement to sell the house because he had loaned the Earnests Jr. the money to buy their new house. Earnest Sr. was to get his money from the sale of the Rhett Street home. Since Earnest Jr. was busy, Earnest Sr. took care of listing and selling the property. Earnest Sr. testified he had owned the house for ten years and Earnest Jr. had owned the house for ten years. Earnest Sr. acknowledged that he stated on the property condition disclosure that he had owned the house for nineteen years and that he was an absentee owner. Earnest Sr. stated he did not consider the statements lies but that he did not provide enough explanation. Earnest Sr. testified the price was set at $200,000 because the realtor stated that was the highest price that would be paid for a house in that location. After the plaintiffs had signed the agreement to buy the house, Mr. Sanders told him not to worry about damage on a wall because the Sanders were going to remodel that area.
Earnest Jr. (Joey) testified that he and his wife moved into the house in July 1986, purchased a new home in April 1996 and moved out in July 1996. Almost four months later the house was listed for sale on October 20, 1996. In the last two years he lived there he saw some water seepage coming in at the stairwell where water went into the light fixture at the base of the stairwell. Joey explained that was caused by a damaged drain in the back courtyard causing water to go down the retaining wall into the light fixture. Once repairs were made, they had no recurrence.
Water also seeped through the carport ceiling onto a car. Joey explained that was caused by a leak in a shower in the master bedroom. In the 1995 remodeling, the shower was eliminated and the problem stopped. Water also pooled beneath the fireplace clean out. Joey believed that water was coming down the chimney and not through the retaining wall, but only in very hard, windy rainstorms. He also saw seepage on the top of an interior steel beam in the carport.
In the remodeling, the Earnests Jr. did extensive sealing and painting, but the only work done to the carport walls was *401 repainting. The Earnests Jr. removed carpet from one of the store rooms during the 1995 remodeling because there was termite residue under it. Further, he did not want carpet in that room because they used the room as a weight room. In the remodeling upstairs they removed the carpet from the former plant room which was incorporated into the remodeled bathroom. The carpet which had extended from the plant room down the stairs was removed.
When Ron Smith contacted Joey about water leaks and asked if any had existed before, Joey testified that he explained that during very wet times of the year, water seeped through the concrete wall and would collect on top of a beam. Asserting that the water never flowed or dripped constantly, Joey explained they kept a spare key on top of the beam. They noticed it because occasionally when they retrieved the spare key, a little water would be on the beam. Joey averred that when he lived in the house there was never any leakage like that depicted on the Sanders' videotape of leaks placed into evidence. Joey stated he occasionally had mildew which he cleaned with a brush and Clorox. At humid times there was condensation on the retainer walls.
Joey stated that the couple remodeled because they had decided to stay in the home while their children were in high school. During the remodeling which involved removing portions of the garage ceiling to get to the bathroom plumbing, the Earnests Jr. gutted the plant room, two separate bathrooms and a closet. After the remodeling they had one huge bathroom with one large shower/tub combination, walk-in closets, a wet bar, double sinks and a commode. After consulting with his father, they decided to correct the temperature fluctuations by adding insulation and another ceiling in the carport, instead of putting in garage doors. Joey also testified about various occasions on which he had large heavy equipment at his house, primarily for use in work on the pool and backyard area and, on occasion when their company was redoing streets in that neighborhood. During remodeling, he also had a dump truck at the house for hauling away lumber and trash.
Joey also explained that they frequently had to deal with live springs in building roads. The method they used was the same as that done on the house; i.e., a trench is dug in the area of the spring and filled with pea gravel. Perforated PVC pipe covered with filter cloth is placed into the gravel to act as a wick to draw the water and drain it away.
In response to questioning about a sink hole in the front yard, Joey stated he figured out after the trial started that the plaintiffs meant the sewerage clean out that was located in the grass on the right side of the front walk. Joey assumed that the four and one half-inch PVC cap had broken off because before, it always stuck up in the grass.
Later that spring after they had completed the renovations, they had the opportunity to purchase a home from a man who did not want to place his home on the open market due to problems with a drainage ditch behind his home. He knew the Earnests had the equipment and know how to fix the problem and suggested they buy his house which was larger and more expensive than the one they were living in on Rhett Street. They made the decision to buy the house in April 1996 and borrowed funds from Earnest Sr. Initially, they were going to sell the Rhett Street house back to his father for his own use. Earnest Sr. later decided not to use it himself but to sell the property. At the time of listing, the Earnests Jr. owned the house and Earnest Sr. was acting for them.
*402 The remodeling was completed at the end of 1995 or early 1996. Thereafter, no repainting, retouching or remodeling was done on the downstairs carport area. Joey testified that no part of the remodeling or the installation of the second ceiling in the carport was done for the purpose of concealing a water leak. Joey stated that the problems depicted in the video did not exist at the time of the sale. Joey stated that there was no problem with the house about which to inform the Sanders before the sale and that the letter from the Sanders stating they wanted to recover the costs of finding and repairing the problems was not a demand that the Earnests repair the house.
Brian Smith, a civil engineer hired by the Sanders, testified that he made numerous inspections of the property to determine if there was a problem and if it was fixable. Smith concluded that the leakage during and after rains created a problem because the water traveled throughout the ceiling area which served as a floor for the portions of the house above. Smith also found that a void existed underneath the slab foundation of the house due to the presence of soil particles being carried out by the water and by the fact that during termite treatment, the technician informed his boss that he could not get back pressure on his injection device. In Brian Smith's opinion, the void problem had been present for quite some time, possibly several years, because it takes time for a void to develop. Smith was unable to locate the exit pipe for the drainage system placed under the house during initial construction.
In order to ascertain and fix the problems, Brian Smith gave the following estimates: $4000 to $5000 for ground penetrating radar to determine the size of the voids; $200 to $5000 to plug leaks; $3000 to $4000 for new french drains in front; $6000 for directional boring for rear portion; $6000 for filling voids and $6000 for engineering fees. Additional costs would be incurred to repair wood, piping and landscaping. Smith stated that his estimate was a starting point and there was no guarantee that would fix the problem. On cross-examination, he acknowledged that, if improper termite boring caused the problems, it could be fixed for less than $100. Further, the separation of joints on his first inspection would have begun shortly after the first several rains. Brian Smith also opined that Ron Smith properly did the foundation inspection report which he characterized as adequate. The witness did fault Ron Smith for failing to mention a leak in the report. He acknowledged that Ron Smith stated in his deposition that he told the Sanders about the leak and that if everything occurred as Ron Smith said, Brian Smith could not say Ron Smith failed in anything he was hired to do.
Testifying next was Ron Smith, president of S & R, who stated he was a registered civil engineer and a registered environmental engineer. Ron Smith stated that on the morning of October 23 he received a call from Mr. Sanders stating he was about to buy a home with a large retaining wall on a sloped site. Sanders expressed concern about the retaining wall leaning or sliding and requested that Smith look at the wall to make sure it was not creating a problem. That morning Smith went to the house to look at the retaining wall foundation. Smith stated that Sanders was elated. Sanders kept repeating what a good deal he was getting, how he was buying a $250,000 to $450,000 house for $200,000 and how expensive it would be if Sanders had to build that foundation. Sanders wanted Smith to see two areas down near the floor that had evidence of water leaks; i.e., the fireplace clean out and an air conditioner duct area *403 where it was evident water had leaked through the wall. Sanders informed Smith that he was planning to put his car wash business in that room and with the deal he was getting on the house, two water leaks through the wall in the lower area did not bother him. Smith stated he did not consider the leaks a structural problem in the wall which had weep holes to permit water to pass through. Structural problems occur when pressure from water accumulating behind a wall builds. Smith saw no evidence of water leaks in the ceiling area. Smith opined that if the leaks shown in the video existed at the end of 1995, he would have seen signs of the leaks during his October 1996 inspection. Smith opined that damage such as staining and wood buckling would have begun immediately when the leaks depicted in the video commenced. Smith concluded that the leaks shown on the video did not exist when he made the October 1996 inspection. Smith returned a couple of days later because he had seen signs of termite damage upstairs. A part of the wall was removed for him to inspect. No evidence of damage or water stains was found.
Months later Sanders called Ron Smith to return to the home. Smith stated it was raining and a tremendous amount of water was leaking through the ceiling soffit. At Sanders' request, Smith called Joey who stated that in the past in very wet conditions it leaked mostly around the fireplace and air conditioner duct. They did not discuss ceiling leaks. Smith recommended that the Sanders tear out some of the plywood panels and look for the source of the leak. Mr. Sanders did not want to do that. Smith also recommended that a shallow french drain would eliminate a major part of the water coming over or through the retaining wall. Sanders indicated he would make that improvement. Sanders later called Smith out to see the "pretty good size little" sink hole in the front yard. Smith stated that Joey's testimony about the broken sewerage clean out was very consistent with what he observed. At that time in April some very large bushes had been removed from the front of the house. Smith recommended that the Sanders take a sample of the water to the city to be tested free to determine if it was ground water or city water. Smith did not know if that was done.
In Ron Smith's opinion, the leaks near the floor (fireplace clean out and air conditioner duct) had been there some time, but the high leaks in the garage ceiling were new. On his initial inspection in October, the ceiling was pristine. That area had been painted during the renovation six months earlier. Had the ceiling leaks existed in October 1996, evidence of deterioration, which appears quickly, would have been present. In order to correct the problems, after ruling out a plumbing leak, Smith recommended the ceiling be torn out so the area could be inspected. If water was coming in over the top of the wall, Smith recommended lowering the grade on the other side of the wall and installing a french drain at an estimated cost of $2000 to $3000. Smith acknowledged that at trial the damage would be worse than it was when he saw the leaks in February 1997.
Citing the examples of Spring Lake Subdivision and the natatorium at Centenary College, Smith explained that while building over a spring was not preferred, it was certainly not unusual in this area. Smith also opined that using pea gravel and french drains was the proper way to deal with springs. Further, he was not surprised that voids existed under the house because using gravel for drainage purposefully created a void. Smith stated that he was not asked by the Sanders to *404 do a much more expensive drainage survey, but simply to look at the foundation.
In answering questions about his report to the Sanders, Ron Smith stated that the report noted there was water standing on the floor of the store room, but he did not use the words "water leaks."
The witness's testimony included a lengthy explanation of the desirable type of voids behind retaining walls so water can drain and not build up pressure to weaken the wall. That drainage should include fine silt and fines (tiny bits of soil) that would stop up the drains if they were not carried out by the water. The silts he saw during his February 1997 visit to the house indicated to him that the Earnests had properly built a drainage system for the house.
In looking for the source of the high leaks, Smith wanted to take down ceiling panels but Sanders did not approve that action. At their February meeting, Smith said Sanders was very upset, cursing and stating he was going to sue the Earnests. Sanders became very angry with Smith when he would not agree to write a letter which would support Sanders' lawsuit against the Earnests. Smith refused because Sanders wanted statements included in the letter that attacked the house and that were contrary to Smith's opinion that the dramatic leaks were new leaks.
An electrician, Charles Ralph Collins testified that he began working for L.J. Earnest, Inc., in 1992 as a maintenance supervisor and continued working for the company which later purchased the Earnest corporation. He worked as an electrician on the renovations to the Rhett Street house while the Earnests Jr. resided there. Present when the garage ceiling was removed for repairs, plumbing and electrical work, Collins stated the only water stains present were at the location of the old shower, an area that was restabilized and repaired by carpenters at that time. Collins stated he went to the house on many occasions to do various electrical work. Although he could not give dates and times, he said he was certain he was there during rain. He always entered the home through the carport stairs. Collins stated he had seen the Sanders' video of leaks and he had never seen any leaks like what was shown on the video. Collins worked at the home after the remodeling project but before the Earnests Jr. sold it. The last time he was at the home he worked on lights in the retaining wall and next to the pool. On cross-examination, Collins stated he did see some water in fluorescent light fixture covers from the garage.
Nora Fancher, the real estate agent for the sale, testified that the house was worth more than a seller could get for it due to its location. Also due to location, she stated its rental value in October 1996 was $1200 per month. Fancher viewed the videotape of the leaks in the carport. In her opinion, if the leaks occurred only when it rained and only in the carport, the house would still rent for $1200 per month due to the big demand for nice rental property. On cross-examination, Fancher acknowledged that the presence of rotten wood and unhealthy mold would make the house hard to rent.
Terry Earnest, the wife of L.J. (Joey) Earnest, Jr., testified that they were not thinking of moving when they remodeled the home. The witness testified she was in the carport on a daily basis and never saw any leaks like those on the Sanders' video.

DISCUSSION
La. C.C. art. 2520 states:
The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.

*405 A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.
A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.
La. C.C. art. 2531 provides, in pertinent part:
A seller who did not know that the thing he sold had a defect is only bound to repair, remedy, or correct the defect. If he is unable or fails to do so, he is then bound to return the price to the buyer with interest from the time it was paid, and to reimburse him for the reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing, less the credit to which the seller is entitled if the use made of the thing, or the fruits it has yielded, were of some value to the buyer.
In Gaston v. Bobby Johnson Equipment Co. Inc., 34,028 (La.App.2d Cir.11/3/00), 771 So.2d 848, this court explained redhibition. A seller warrants the buyer against redhibitory defects or vices in the thing sold. A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed the buyer would not have bought the thing if he had known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale. La. C.C. art. 2520. The implied warranty against redhibitory defects covers only hidden defects, not defects that were known to the buyer at the time of the sale, or defects that should have been discovered by a reasonably prudent buyer. La. C.C. art. 2521. To recover, the plaintiff must prove that the defect existed at the time of sale, and that he gave the seller an opportunity to repair the thing. Proof can be made by direct or circumstantial evidence, giving rise to a reasonable inference that the defect existed at the time of the sale. The existence of redhibitory defects is a question of fact, and the trial court's conclusions about them should not be set aside absent manifest error. An appellate court may not set aside a trial court's finding of fact absent manifest error or unless the fact finder is clearly wrong. Gaston, supra.

Existence of Redhibitory Defect
On appeal the Earnests contend that the trial court erred in finding that a redhibitory defect existed in the house at the time of the sale to the Sanders. The testimony of the plaintiffs and the video they placed into evidence established that the lower portion of the home had significant water leakage in a number of places within months after the sale. The Sanders and Ron Smith, their initial engineer, agreed that the carport area was in perfect condition at the time they examined it in October 1996. The Sanders first noticed the problem in February 1997 after the November sale.
However, the Sanders did not observe the leaks during the time from November until early February when they were remodeling the home. The expert testimony of the engineers was that damage from the type of water infiltration shown on the video would occur very quickly.
The Earnests, Jr. and their witnesses stated they had never observed the type of leaks depicted in the Sanders' videotape. Joey Earnest described water leaks that occurred while he owned the home and *406 also explained how the sources of those leaks were repaired. He admitted that during very wet periods, he noticed some water seepage which collected on top of a beam in the garage where the family kept a key, but he never saw flowing or dripping water. Joey also stated that he cleaned up occasional mildew in the garage area with Clorox and had occasional condensation on concrete walls. None of the events Joey described rise to the level of the water infiltration depicted in the Sanders' video.
Earnest, Sr. provided testimony that the drainage system placed around the retaining walls was not a lifetime installation. The trial court reasonably concluded that the defects in the water drainage system, though not apparent at the time of the sale, existed at sale, deteriorated and became apparent after the sale. The existence of a redhibitory defect is a question of fact which will not be disturbed absent manifest error. Finding no manifest error, we conclude that the Earnests' argument that the plaintiffs did not prove the existence of a redhibitory defect is meritless.

Good Faith of Sellers
In contrast to a good faith seller, a seller who knew of a defect and failed to disclose it is liable to the buyer for the return of the purchase price with interest from the date of the payment, reimbursement of reasonable expenses occasioned by the sale and expenses incurred in preserving the thing, and damages and attorney's fees. The seller is entitled to credit for use the buyer makes of the thing. La. C.C. art. 2545. Demanding a remand for assessment of damages against bad faith sellers, the plaintiffs argue that the trial court erred in finding the Earnests, Jr. were in good faith.
The Sanders contend on appeal that the Earnests' pleadings and discovery demonstrate the Earnests were in bad faith because the statements constituted judicial confessions that the Earnests had knowledge before the sale of the exact leaks about which the Sanders complained. A judicial confession is a declaration made by a party in a judicial proceeding. It constitutes full proof against the party who made it. La. C.C. art. 1853. A judicial admission or confession is a party's express acknowledgment of the correctness of the fact or the act charged against him by his adversary. Such a confession is designed to dispense with evidence and has the effect of withdrawing the subject matter of the confession from issue. Succession of Poland, 34,291 (La.App.2d Cir.4/4/01), 784 So.2d 701.
Specifically, the plaintiffs rely upon the defendants' statements in their answers that (1) the condition was apparent and readily discoverable by inspection, common to below ground structures in this area and the defendant had no duty to disclose; (2) the landscaping activities of the Sanders "increased the amounts of water seepage"; and (3) the price set for the property took into account its condition. The plaintiffs also pointed to admissions in discovery that during excessive rainfall when the ground became saturated, there would be small amounts of seepage at the top of the concrete wall where the interior-most steel beam came through the concrete in the garage.
The pleadings and statements on which the plaintiffs rely are not judicial confessions establishing the defendants' bad faith. The location and amount of leaks and seepage were vigorously disputed facts. Each of the foregoing statements were explained during defense testimony. Ron Smith, the engineer initially hired by the plaintiffs, testified that Mr. Sanders *407 directed him to areas of obvious and readily apparent signs of water infiltration by the fireplace clean out and the air conditioning duct. Those problems were included in Ron Smith's report to the plaintiffs. Smith stated that Mr. Sanders wanted to ignore those apparent problems because of the use he planned to make of the area and the favorable price he was getting on the house. Ron Smith carefully differentiated between the apparent evidence of what he characterized as the low leaks when he made his initial inspection and the high leaks over and through the retaining wall which had damaged the "pristine" garage area when he returned after the Sanders discovered the leakage in February after the November 1996 sale.
Joey Earnest testified about previous leaks and how they were corrected. He also noted the occasional presence of small amounts of non-dripping and non-flowing water on the steel beam during extremely wet periods. L.M. Haire, a carpenter employed by Earnest, testified that he replaced wood with signs of termite infestation in a wall adjacent to the concrete retaining wall. Haire explained the dampness he observed was inevitable any time concrete adjoined wood no matter how the concrete was water proofed. Except for the plumbing leak in the garage ceiling from shower plumbing explained in Joey's testimony, Haire saw no leaks in the carport ceiling. He corroborated that the insulation and second garage ceiling were added to keep the floor of the bedroom above from being cold.
While the defense contended that the landscaping done by the buyers contributed to the seepage and leaks, the trial court found that the redhibitory defect in the drainage system was present but not apparent at the time of sale. There was also testimony that the location of the house limited the amount that could be obtained at sale.
The trial court has great discretion in finding facts and assessing the witnesses' credibility. Those findings should not be disturbed absent a showing of manifest error; a reasonable trial court finding cannot be reversed merely because the appellate court could draw an equally reasonable yet different finding. Harrison v. Gore, 27,524 (La.App.2d Cir.8/23/95), 660 So.2d 563, writ denied, 95-2347 (La.12/8/95), 664 So.2d 426. The trial court's finding that the defendants were not aware of the redhibitory defect was reasonable in light of the evidence in the record.

Buyers' Lack of Knowledge of Defects
The trial court apparently accepted the testimony of Ron Smith that the Sanders were aware of at least some of the water problems noted in his report and opted to buy the property anyway. Prior to their discovery of the leaks in the garage, the plaintiffs expended some $62,000 on repairs and renovations to the property. However, for the same reasons that the Earnests were found to have been good faith sellers with no knowledge of the failure in the subsurface drainage system, the Sanders likewise, were not aware of the hidden defects in the drainage system which became apparent when the Sanders moved into the home in February 1997 after the November 1996 purchase.

Notice of Defects to the Sellers
La. C.C. art. 2522 requires that the buyers give the sellers notice of a redhibitory defect in the thing sold. Ron Smith contacted Joey Earnest in March 1997 about the leaks in the garage area. Further the record contains the June 11, 1997 letter from counsel for the plaintiffs to the Earnests, Jr. demanding that they pay to the plaintiffs the cost of ascertaining the extent *408 of the problem and repairing the house. The Earnests, Jr. acknowledged they made no effort to repair the problems, since they denied the existence of a redhibitory defect.

Liability of Smith & Raley, Inc.
The plaintiffs urge that the trial court was manifestly erroneous in finding that Ron Smith was not negligent in his pre-purchase inspection of the home on their behalf. Ron Smith testified that the garage area was in perfect condition at the time of his October 1996 inspection. His testimony was that Mr. Sanders directed him to evidence of water at the fireplace clean out and water near an air conditioner duct in a storeroom. These were noted in his October 24, 1996 report on his foundation observation on the plaintiffs' behalf. The report specifically excluded a number of items including excessive rains and changes in drainage and declared that no warranty or guarantee was included with the report.
The testimony of the plaintiffs' own engineering expert, Brian Smith, was that Ron Smith's inspection was adequate; the only criticism was the omission from the report that the moisture around the fireplace clean out was a leak in the retaining wall. Specifically finding that the sources of this water were not ascertained before the purchase, the trial court apparently accepted Smith's testimony that Mr. Sanders chose to ignore the water infiltration noted because of the use he planned to make of the storage areas and the advantageous price he was getting on the home. Based upon this record, the trial court's conclusion that the plaintiffs did not prove negligence by Smith & Raley, Inc. in the pre-sale inspection is neither manifestly erroneous nor clearly wrong.

Liability of L.J. Earnest, Sr.
Seeking a remand for assessment of damages against bad faith sellers, the plaintiffs want L.J. Earnest, Sr. to be found personally liable because he listed the home as owner without indicating he was acting as an agent and because Earnest, Sr., as builder of the home, should be automatically held in bad faith. The redhibition claim is between sellers and purchasers. A redhibition action cannot be maintained absent such relationship. Long v. Bruns, 31,427 (La.App.2d Cir.1/20/99), 727 So.2d 664, writ denied, 99-0484 (La.4/23/99), 742 So.2d 881.
Earnest, Sr. was not the seller of the property. He acknowledged that he built the home and acted on behalf of the Earnests, Jr. to place the property on the market. While the buyers may have been confused initially about who owned the property the record is clear that they contacted Joey Earnest to attempt to delay the closing and that the Earnests, Jr. were the sellers who transferred the property at the closing The trial court did not err in denying any personal liability against L.J. Earnest, Sr.

Rescission v. Reduction of the Purchase Price
Maintaining that the trial court erred in limiting their recovery to a reduction of the purchase price, the Sanders want the sale rescinded and the matter remanded for a determination of damages associated with the rescission. In the plaintiffs' view, the defects with the home were not inconveniences, but major problems including failure of the subsurface drainage system with water infiltration through and over the retaining walls.
La. C.C. art. 2541 provides:
A buyer may choose to seek only reduction of the price even when the redhibitory defect is such as to give him the right to obtain rescission of the sale.

*409 In an action for rescission because of a redhibitory defect the court may limit the remedy of the buyer to a reduction of the price.
According to the comments to the article, the price reduction that may be demanded under C.C. art. 2541 is the difference between the sale price and the price that a reasonable buyer would have paid if he had known of the defects. A principal element in formulating a reduction of the purchase price is the cost of repairs. In sales of immovable property the amount to be awarded is the amount necessary to convert an unsound structure into a sound one. Here, plaintiffs petitioned in the alternative for either rescission of the sale or reduction of the purchase price. Under La. C.C. art. 2541, it is within the discretion of the trial judge to award a reduction in the purchase price rather than to order the sale rescinded. Destefano v. Crump, 96-951 (La.App. 5th Cir.4/9/97), 694 So.2d 424.
Asserting the trial court erred, the Sanders contend that the discretion of the trial court to order a reduction in the purchase pride under art. 2541 is limited to minor or easily repaired defects. The plaintiffs rely upon Nassif v. Sunrise Homes, 97-905 (La.App. 5th Cir.10/28/98), 720 So.2d 452, reversed in part on other grounds, 98-3193 (La.6/29/99), 739 So.2d 183, in which the costs to repair the foundation were estimated at $25,000 to $30,000 and the sale was rescinded. Factually distinguishable, the Nassif home did not conform to the Jefferson Parish Building Code and was damaged by the differential foundation settlement of 13 to 14 inches which left the house with a noticeable drop from the front to the rear of the house. Further, the experts testified that the family could not remain in the home while repairs were performed.
In this case, the record does not show that the problems in the garage area actually had a negative impact on the upper portion of the home which contained all the living areas. The Sanders failed to prove that their alleged illnesses were related to the home. The plaintiffs chose to vacate the home on advice of an environmental consultant who acknowledged that his recommendations were based upon speculation and possibilities, since no testing had been conducted on the home. The videotape of the water problems on the lower level showed the Sanders' dog and dog house left by the plaintiff when they moved out to give the impression that the home was occupied. While the water depicted was undoubtedly a nuisance which made parking in the garage inconvenient due to the puddles of water, the record does not show that the house was useless or unfit for ordinary use as a residence. Therefore, the trial court did not abuse it discretion in ordering a reduction in the purchase price, instead of rescission.
La.C.C. art. 2531 states that if the seller is unable or fails to repair the defect after notice, he must return the purchase price to the buyer along with other expenses set out in the article. However, La. C.C. art. 2541 gives the trial court the discretion to award a reduction of the purchase price instead of rescission in actions for rescission. Laws on the same subject matter must be construed in pari materia. La. C.C. art. 13; Bankers Ins. Co. v. State, 32-460 (La.App.2d Cir.10/27/99), 743 So.2d 870. Since the Earnests, Jr. have denied the existence of a redhibitory defect consistently through this appeal, they made no effort to repair. The facts and circumstances of this case make a reduction in the purchase price the appropriate remedy. The trial court property exercised its discretion under La. C.C. art. 2541 in fashioning that remedy. Had rescission been appropriate, then the provisions of La. C.C. art. 2531 would have been applicable in determining quantum.

*410 Quantum

Expert testimony on repair costs varied from less than $100 if improperly bored termite treatment holes caused the leaks, to $24,500 for redoing the subsurface drainage system. The trial court adopted the testimony of the plaintiffs' expert, Brian Smith, and ordered a $24,500 reduction in the purchase price of the home. Brian Smith testified that the figure did not include costs for removal and repair of wood structures in order to stop the leaks. The engineers recommended that the ceiling be removed in the garage for a definitive determination of the nature of the seepage. Mr. Sanders estimated that the materials would cost $6000 and the labor would range from 2 to 4 times the cost of materials.
In reducing the purchase price, the principal elements in determining the appropriate award are the cost of the repairs and the costs of converting an unsound structure to a sound one. Destefano, supra. The trial court's assessment of $24,500 as a reduction in the purchase price is amended to include an additional $18,000 for the cost of removal and restoration of the garage ceiling. The plaintiffs are awarded legal interest from the date of judicial demand.

DECREE
The judgment of the trial court is amended to increase the amount awarded as a reduction in the purchase price to $42,500, plus legal interest from the date of judicial demand. Costs are assessed equally to the plaintiffs and to the Earnests, Jr.
AMENDED, AND AS AMENDED, AFFIRMED.