861 So.2d 536 (2003)
Mark CHEAIRS
v.
STATE of Louisiana, through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Baton Rouge Police Department, The State of Louisiana, through the Department of Public Safety and Corrections State Farm Mutual Automobile Insurance Company.
No. 2003-C-0680.
Supreme Court of Louisiana.
December 3, 2003.
*538 Douglas M. Chapoton, Richard P. Ieyoub, Attorney General, Stacey A. Moak, Baton Rouge, for Applicant.
Daniel J. McGlynn, Karl J. Koch, Baton Rouge, for Respondent.
CALOGERO, Chief Justice.
Defendant, State of Louisiana, through the Department of Transportation and Development ("DOTD"), appeals a judgment of the First Circuit Court of Appeal, which affirmed a jury verdict allotting 55 percent fault to the DOTD for an accident that occurred when a vehicle being driven by plaintiff, Mark Cheairs, struck a stationary DOTD "Roadrunner" from the rear, causing him serious injuries. DOTD asserts that the jury's verdict was improperly based in part on opinion testimony from plaintiff's expert witness, Michael Gillen, that DOTD violated provisions of the Manual of Uniform Traffic Control Devices ("MUTCD"), an opinion that Gillen was purportedly not qualified to give because he is not a traffic engineer. Alternatively, DOTD asserts that both the jury's finding that DOTD's negligence caused the accident and the jury's decision to allot 55 percent of the fault to DOTD were manifestly erroneous.
On the expert witness issue, we find that the factors established by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) do not directly address the issue presented herei.e., whether an expert has the proper qualifications to testify, because the only issue directly addressed by Daubert is the reliability of an expert's methodology. We further find that the district court did not abuse its discretion when it found that Gillen was qualified to testify as an expert and admitted Gillen's expert testimony in part based on his application of the standards set forth in the MUTCD. Finally, on the basis of the record evidence, we find no manifest error in the jury's decision to impose a portion of the liability for the accident on the DOTD or in its allocation of 55 percent of the fault to DOTD.

FACTS AND PROCEDURAL HISTORY
Sometime during the early morning hours of April 2, 1997, an unidentified vehicle dropped metal rods[1] on the roadway of the Mississippi River Bridge in Baton Rouge, Louisiana. A passing motorist reported the presence of the rods to the Baton Rouge Police Department. Officers Frank Caruso and Tim Browning were dispatched to the bridge to investigate the report. When they saw the rods on the roadway,[2] they called the DOTD to send someone to pick up the rods.
DOTD employee Adam Broussard, who was operating the department's "Roadrunner" vehicle on the day in question, proceeded to the bridge to pick up the rods. Testimony at trial established that the Roadrunner was a special maintenance vehicle used by DOTD employees to quickly pick up debris on the interstate. The Roadrunner was an orange pick-up truck with a lighted electronic arrow board measuring 60 inches by 30 inches mounted on top of the cab. The Roadrunner was also *539 equipped with two revolving yellow lights mounted on top of the cab. The Roadrunner may also have had orange flags mounted at the back, but trial testimony on that issue was inconsistent.
Broussard arrived at the location of the rods in the eastbound lane of the bridge at approximately 8:15 or 8:30 a.m. When he saw 30 or so metal rods on the roadway, he stopped the Roadrunner in a travel lane, turned on the arrow board, got out of the truck and picked up the rods, without incident. While picking up the rods in the eastbound lane, Broussard noticed that some eight or nine additional rods were lying on the westbound side of the bridge. Accordingly, he drove the Roadrunner to an exit, then proceeded to return across the bridge in the westbound lane. Again, Broussard stopped the Roadrunnerthis time in the far left travel laneand got out of the vehicle. Because he had stopped the Roadrunner midway between the place where the dropped rods began and the place where they ended, Broussard testified that he walked past the back of the Roadrunner, while he was signaling the traffic to move over with his hand.
At about the same time, plaintiff was driving his vehicle up the ramp to the Mississippi River Bridge. Plaintiff testified that he was following a white sedan that obscured his vision, making it impossible for him to see the Roadrunner until the white sedan abruptly changed lanes in order to avoid the stationary Roadrunner. By the time he saw the Roadrunner, plaintiff stated, he did not have time to make a safe lane change, which would have involved checking his mirrors to see if another vehicle was coming in the lane to his right. He simply tried to go around the Roadrunner as safely as possible under the alarming circumstances confronting him. However, because he did not have sufficient time to move over, the left front driver's side of his vehicle struck the right back passenger side of the Roadrunner. Plaintiff was badly injured as a result of the accident.
Plaintiff filed suit against a number of defendants, including the DOTD and another Louisiana State agency, the Department of Public Safety and Corrections. Also named as defendants were the Baton Rouge Police Department and State Farm Mutual Automobile Insurance Co. Liability and damages were bifurcated for trial, and liability alone was tried to a jury. The jury returned a verdict allotting 55 percent fault for the accident to DOTD, 41 percent fault to plaintiff, and 4 percent fault to the phantom vehicle that had apparently spilled the steel rods on the roadway of the bridge. The district court issued a judgment conforming to the jury verdict. The district court denied DOTD's motion for new trial. DOTD appealed to the First Circuit Court of Appeal, which, in an unpublished opinion, affirmed the trial court judgment, then denied DOTD's application for rehearing. Cheairs v. State of Louisiana, XXXX-XXXX (La.App. 1 Cir. 12/20/02), 837 So.2d 761. This court granted DOTD's application for supervisory writs to review the judgment below. Cheairs v. State of Louisiana, XXXX-XXXX (La.05/09/03), 843 So.2d 383.

EXPERT WITNESS QUALIFICATIONS
By its first two assignments of error, DOTD asserts that the district court erred as a matter of law by misapplying the standard governing admissibility of expert testimony established by the United States Supreme Court in Daubert and adopted by this court in State v. Foret, 628 So.2d 1116 (La.1993), and that the appellate court improperly failed to find that the district court abused its discretion when it allowed plaintiff's expert to testify.
*540 In this case, plaintiff offered the expert testimony of Michael S. Gillen, a retired 20-year veteran of the Baton Rouge City Police Department, who had been employed since 1993 by a private corporation, National Collision Technologies, as a traffic reconstructionist. DOTD filed a motion in limine requesting that the district court hold a pre-trial Daubert hearing on the issue of whether Gillen was qualified to testify concerning application of the standards set forth in the MUTCD, which is a publication of the U.S. Department of Transportation, Federal Highway Administration, that "provides standards for design and application of traffic control devices." MUTCD § 1A-4 (1998 ed.). DOTD challenged Gillen's qualifications to apply the standards set forth in the MUTCD on the basis of the following highlighted language from § 1A-4 of MUTCD:
The decision to use a particular device at a particular location should be made on the basis of an engineering study of the location. Thus, while this Manual provides standards for design and application of traffic control devices, the manual is not a substitute for engineering judgment. It is the intent that the provisions of this Manual be standards for traffic control devices installation, but not a legal requirement for installation. Qualified engineers are needed to exercise the engineering judgment inherent in the selection of traffic control devices, just as they are needed to locate and design the roads and streets with the devices complement. Jurisdictions with responsibility for traffic control, that do not have qualified engineers on their staffs, should seek assistance from the State highway department, their county, a nearby large city, or a traffic consultant.
(Emphasis supplied by DOTD.) On the basis of the above language, DOTD argues that only traffic engineers are qualified to testify concerning the application of the standards set forth in the MUTCD.
Plaintiff points, however, to other provisions of the MUTCD, which seem to indicate that persons other than traffic engineers are qualified to apply the provisions of the manual. For example, plaintiff cites language from the official website of the United States Department of Transportation, Federal Highway Administration, found under the heading, "Who Uses the MUTCD? And How?" The answer given is, in pertinent part, as follows:
Probably many more folks in more diverse professions than you might imagine. And they use the information for very different reasons! Here's how.
* * *
Organizations with completely different charters and constituents depend on the MUTCD. For example, law enforcement personnel rely on the MUTCD as they monitor driver behavior and investigate traffic incidents. The insurance and legal communities frequently refer to the MUTCD when investigating claims or proceedings with legal activities that arise from traffic-related incidents.
http://mutcd.fhwa.dot.gov/kno-users.htm.
Admissibility of expert testimony in Louisiana is governed by La.Code of Evid. art. 702, which provides as follows:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The above article follows Fed. Rule of Evid. 702, according to Official Comment *541 (b) (1988) to La.Code of Evid. art. 702. A district court is accorded broad discretion in determining whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert. Official Comment (d), citing 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02] (1981). See also Merlin v. Fuselier Const., Inc. XXXX-XXXX, p. 12 (La. App. 5 Cir. 5/30/01), 789 So.2d 710, 718 ["Whether an expert meets the qualifications of an expert witness and the competency of the expert witness to testify in specialized areas is within the discretion of the trial court."] A district court's decision to qualify an expert will not be overturned absent an abuse of discretion. Id.; State v. Castleberry, XXXX-XXXX (La.4/13/99),758 So.2d 749, 776.
In Daubert, the United States Supreme Court set a new standard to assist district courts in evaluating the admissibility of expert testimony. The new standard required the district courts to perform a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. 2786. See also State v. Chauvin XXXX-XXXX (La.5/20/03), 846 So.2d 697, 700-01. In Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the United States Supreme Court held that the analysis established by Daubert is to be applied to determine the admissibility of all expert testimony, not just scientific testimony. Merlin, XXXX-XXXX at p. 12, 789 So.2d at 718. The Kumho Tire case dealt specifically with the issue of whether Daubert applies to engineering expert testimony. 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238.
Daubert established the following non-exclusive factors to be considered by district courts to determine the admissibility of expert testimony:
(1) The "testability" of the scientific theory or technique;
(2) Whether the theory or technique has been subjected to peer review and publication;
(3) The known or potential rate of error; and
(4) Whether the methodology is generally accepted in the scientific community. Daubert, 509 U.S. at 592-94, 113 S.Ct. 2786. This court in Foret characterized the Daubert factors as "observations" which provide a "helpful guide for our lower courts in considering this difficult issue." 628 So.2d at 1123.
As is evident from the nature of the factors listed above, the United States Supreme Court was concerned in Daubert with determining the admissibility of new techniques as a basis for expert scientific testimony. Foret, 628 So.2d at 1121. The Daubert factors are designed to "assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue." Chauvin, XXXX-XXXX at 5, 846 So.2d at 701. Daubert requires that the reliability of expert testimony is to be ensured by a requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Foret, 628 So.2d at 1122, quoting Daubert, 509 U.S. at 580, 113 S.Ct. 2786. Significantly, the Daubert court was clearly not concerned with the issue raised by DOTD hereinwhether the expert is qualified solely by education to give opinion testimony concerning a particular matter. Therefore, an important consideration in this case is the fact that DOTD does not question methodology regarding Gillen's testimony, methodology being the primary concern of the Daubert case.
Moreover, determination of the admissibility of expert testimony under La. *542 Code of Civ. Proc. art. 702 "turns upon whether it would assist the trier of fact to understand the evidence or to determine a fact in issue." Official Comment (c), citing 3 Weinstein & Berger, ¶ 702[02]. Generally, the fact that a witness does not have a college degree does not disqualify him from testifying as an expert if the witness has sufficient experience. Manchack v. Willamette Industries, Inc., 24,599 (La. App. 2 Cir. 8/12/93), 621 So.2d 649, 653. Experience alone is normally sufficient to qualify a witness as an expert. Id.
The above principles should not, however, be interpreted to mean that a court should not consider an expert's qualifications when deciding whether to admit a particular expert's testimony, only that the Daubert case does not directly address that issue. In fact, Daubert itself notes that Fed. Rule of Evid. 702, the counterpart of La.Code of Evid. art. 702, "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." 501 U.S. at 592, 111 S.Ct. 2456. Apparently in recognition of the fact that Daubert does not directly address that issue, the United States Eleventh Circuit Court of Appeal has developed a three-part inquiry to more fully assist district courts in determining all the relevant issues related to the admissibility of expert testimony, with the Daubert analysis serving as one of the three prongs. The three-prong inquiry was first set forth in City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548 (11th Cir.1998), in which the court stated that the admission of expert testimony is proper only if all three of the following things are true:
(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.
Id. at 562, 158 F.3d 548. When the Eleventh Circuit adopted this three-part inquiry in Harcros Chemicals, it cited, inter alia, the United States Third Circuit Court of Appeals' decision in Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224 (3d Cir.), cert. denied sub nom, Moyer Packing Co. v. Petruzzi's IGA Supermarkets, Inc., 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993), in which the court set forth the same basic three-prong inquiry in a different way, as follows:
There are three intertwined bases for excluding testimony under [Federal] Rule 702:(1) if the testimony will not assist the trier of fact; (2) if scientific evidence is not sufficiently reliable; and (3) if the particular expert does not have sufficient specialized knowledge to assist the jurors. See Jack B. Weinstein & Margaret A. Berge, Weinstein's Evidence ¶ 702 101] (1992).
Id. at 1238. As is evident from the above statement, the three factors set forth in the Eleventh Circuit's three-prong inquiry are derived directly from Fed. Rule of Evid. 702, which is identical to La.Code of Evid. art. 702. Further, both the third circuit in Petruzzi's IGA Supermarkets and the eleventh circuit in Harcros Chemicals cite language from Daubert in support of the inquiries they have established.
Because we find that this three-part inquiry provides more comprehensive guidance to district courts determining the admissibility of expert testimony, we adopt the eleventh circuit's inquiry here. The adoption of this three-prong inquiry should not be interpreted as a repudiation of the *543 excellent principles for evaluating the methodology employed by expert witnesses set forth in Daubert and its progeny, including Foret. Those principles will continue to govern the second of the three prongs in the inquiry we adopt herein. We adopt the three-part inquiry only because we recognize that Daubert does not address all of the issues pertinent to the decision to admit expert testimony.
DOTD challenges Gillen's testimony in this case solely on the basis of the first prong of the inquiry listed abovei.e., whether he "is qualified to testify competently regarding the matters he intends to address." At the pre-trial Daubert hearing in this case, Gillen testified that he had worked in the development of traffic control plans, including lane closure issues and rerouting of traffic for incident management. Further, Gillen stated that he had been involved in the implementation of plans designed by others in compliance with the standards set forth in the MUTCD, which he referred to as a "reference manual." Gillen's curriculum vitae also listed the training he had received regarding application of the standards set forth in the MUTCD, as well as his work experience related to that document. Following the Daubert hearing, the district court qualified Gillen as an expert in the field of traffic reconstruction, and rejected DOTD's argument that Gillen was not qualified to apply the standards set forth in the MUTCD.
At trial, Gillen's testimony included his opinion concerning the actions the DOTD should have taken in order to comply with both the standards of Part VI of MUTCD, relative, among other things, to "Incident Management Operations," as well as the standards contained in the "Maintenance Traffic Control Handbook," published by DOTD. Gillen testified that both documents recommend the use of two vehicles for lane closures even for the short period of time it would take to pick up the metal rods in this case. Gillen opined that the applicable standards of both MUTCD and the DOTD handbook were designed to encourage redundancy and conspicuity in the use of warning devices. DOTD improperly failed to use redundant, conspicuous warning devices to manage the incident in question, Gillen said.
We have closely reviewed the district court's decision to qualify Gillen as an expert in traffic reconstruction and to allow him to testify concerning application of the standards set forth in the MUTCD in light of the evidence presented at the pre-trial "Daubert" hearing, and find no abuse of the district court's exercise of its broad discretion in its determination to allow expert testimony in this case and to allow Gillen to testify as an expert. In response to DOTD's reliance on § 1A-4 of the 1988 edition of the MUTCD, we believe that the circumstances to which Gillen applied the standards set forth in the MUTCD in this case did not involve the type of "decision to use a particular device at a particular location," which that section requires be based on "an engineering study of the location." Similarly, despite the fact that MUTCD § 1A-4 specifically says that the standards provided therein are "not a substitute for engineering judgment," engineering judgment is not regularly employed in the type of situation that resulted in plaintiff's injuries herein. Obviously, engineers are not regularly involved in making the type of decision Broussard made concerning lane closure in response to a specific unpredictable incident. Those decisions are regularly made by police officers, like Gillen, and people like Broussard, who was assigned by DOTD to perform debris pickup duties on the date in question. In fact, DOTD allowed whatever employee was assigned to the Roadrunner to make decisions *544 about lane closures and other traffic control devices necessary to incident control on a regular basis. Certainly, DOTD did not consider it necessary to undertake an engineering study of the location before allowing Broussard to close the lane in order to pick up the metal rods.
Further, regarding the other sentence from MUTCD § 1A-4 highlighted by DOTD, we believe it is axiomatic that "[q]ualified engineers are needed to exercise the engineering judgment inherent in the selection of traffic control devices, just as they are needed to locate and design the roads and streets which the devices complement." However, that fact does not mean that Gillen, who is not an engineer by education, is not qualified to express his opinion concerning the application of the standards set forth in the MUTCD to lane closures necessary for incident management. The MUTCD is a massive work with provisions covering numerous areas of traffic control; engineers are obviously required to implement its provisions regarding such matters as traffic control devices at particular locations for long-term construction projects, as well as the design of streets and roads and the selection of attendant traffic control devices. However, as demonstrated by DOTD's own procedures, neither the MUTCD nor the DOTD handbook can logically be interpreted to mean that traffic engineers must be employed to make decisions about management of every incident that affects traffic control.
Ultimately, DOTD's argument is counterintuitive. It would be illogical and impractical for this court to conclude that highway department employees must consult an engineer before making any decisions related to traffic control, even when such decisions are necessitated by an unpredictable incident of very short duration, such as the incident at issue herein. In fact, DOTD allowed Broussard to make the decisions challenged in this case and Broussard clearly is not an engineer. Policemen and highway department employees must be allowed to make some decisions on the scene. As indicated by the information from the Federal Highway Department website quoted by plaintiff, the MUTCD is expressly intended to provide guidance to people other than engineers. Further, MUTCD § 1A-4, relied upon by DOTD, specifically permits "jurisdictions with responsibility for traffic control, that do not have qualified engineers on their staffs" to "seek assistance from the State highway department, their county, a nearby large city, or a traffic consultant," which seems to allow persons other than traffic engineers to apply the standards set forth in the MUTCD. The same conclusion could be reached concerning the DOTD handbook, which contains flow charts to guide persons making decisions about incident management that would surely be insultingly simple to a traffic engineer. If engineers alone are to be allowed to make such decisions, the need for the MUTCD and the DOTD handbook would be greatly diminished. If people other than traffic engineers can use the documents, people other than traffic engineers are obviously qualified to testify concerning their use. If Roadrunner operator Broussard is qualified to make decisions about lane closures, expert accident reconstructionist Gillen is certainly qualified to testify concerning the propriety of those decisions.
It should also be noted that the jury heard evidence regarding Gillen's qualifications and was free to afford his testimony whatever weight it deemed appropriate. Prior to the receipt of the testimony, the district court properly found that Gillen was qualified to testify concerning the standards set forth by the MUTCD and properly admitted the expert testimony of *545 Gillen, who is qualified by experience, skill, and training, to state his opinion concerning the propriety of DOTD's actions, based on the standards set forth in the MUTCD and the DOTD's own handbook.

LIABILITY OF DOTD
Alternatively, DOTD challenges the jury's decision to impose liability on DOTD. By its third assignment of error, DOTD asserts that the jury's finding that DOTD negligently conducted the emergency debris pick-up in the westbound lanes of the bridge was manifestly erroneous. By its fourth assignment of error, DOTD asserts that the jury's finding that DOTD's conduct was a cause in fact of the accident was manifestly erroneous.
In civil cases, the appropriate standard for appellate review of factual determinations is, as DOTD acknowledges, the manifest errorclearly wrong standard, which precludes the setting aside of a trial court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Cenac v. Public Access Water Rights Ass'n, 2002-2660, p. 9, (La.6/27/03),851 So.2d 1006, 1023. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. Id. The reviewing court should affirm the trial court where the trial court judgment is not clearly wrong or manifestly erroneous. Id. at 9-10, 851 So.2d at 1023.
In support of its arguments, DOTD invokes the presumption that a following motorist in a rear-end collision has breached the duty not to follow too closely established by La.Rev.Stat.32:81 and therefore is negligent. This court recognized that presumption in Mart v. Hill, 505 So.2d 1120, 1123 (La.1987), in which we noted the fact that the risk of a rear-end collision is clearly within the scope of the statutory prohibition against following too closely. Id. According to DOTD, the cause of the accident was not the conduct of the DOTD, but plaintiff's failure to observe the road ahead and the plaintiff's decision to follow the white sedan too closely for the traffic conditions. DOTD also claims that it should not be held liable for the plaintiff's accident because plaintiff failed to prove that it violated its duty to conform to the standard of conduct of a reasonable person in like circumstances. Joseph v. Dickerson, 99-1046, p. 7 (La.1/19/00), 754 So.2d 912, 916.
As DOTD notes, a presumption of negligence does apply to a following motorist in a rear-end collision. Ordinarily, the effect of the presumption is that the burden of proof shifts to the driver of the following vehicle, who is typically the defendant in the case. See Boudreaux v. Wimberley. XXXX-XXXX, p. 6 (La.App. 3 Cir. 4/2/03),843 So.2d 519, 523. However, in the instant case, the following driver is not the defendant, but the plaintiff, who already bears the burden of proof. Therefore, the burden-shifting effect of the presumption is rendered moot in this case, and the plaintiff continues to bear the burden. Moreover, as recognized by this court in Boudreaux, "[f]ollowing vehicles have escaped liability for rear-end collisions by establishing that the forward vehicle, encountered in the dark, was stalled and unlighted, or that the unpredictable driving of the preceding motorist created a sudden emergency that the following motorist could not reasonably have anticipated." Id. at 6-7, 843 So.2d at 523, quoting Sonnier v. Reed, 532 So.2d 344, 345 (La.App. 3 Cir.1988). In the instant case, plaintiff argued that the DOTD's decision to stop the Roadrunner in the travel lane of the bridge with only the arrow board to warn motorists of its presence created a sudden emergency that he could not reasonably have anticipated.
*546 As revealed by the record in this case, the parties presented two opposing views concerning the cause of the accident at issue herein. In fact, the parties essentially agreed on the salient facts surrounding the accident, and the jury's decision turned on its choice between two theories of liability presented by the two experts. When the district court has allowed both parties to present their experts before making its factual determinations, the factfinder's choice of alternative permissible views cannot be considered to be manifestly erroneous or clearly wrong. See Fussell v. Roadrunner Towing and Recovery, Inc., 99-0194 (La.App. 1 Cir. 3/31/00),765 So.2d 373, 376, citing Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 883 (La.1993).
Ultimately, the DOTD sought to convince the jury that plaintiff was solely liable for the accident in this case both because its conduct was completely reasonable under the circumstances and because plaintiff's conduct was unreasonable. For example, on the issue of the reasonableness of DOTD's action, DOTD asserted at trial that Broussard's decision to stop the Roadrunner in the travel portion of the far right lane was proper under all of the standards set forth in the MUTCD and the DOTD handbook, especially since he would only be stopped in that location for the very short period of time it would take to pick up the rods. DOTD sought to support its theory of the case primarily through the testimony of its expert traffic engineer, John Mounce, that Broussard followed proper departmental policy and met all of the requirements for stopping in the travel lane when he activated the lighted electronic arrow board, which Mounce repeatedly characterized as the best possible device for warning the motoring public concerning lane closures. On the issue of the unreasonableness of plaintiff's conduct, DOTD points to testimony that plaintiff's vision was greatly impaired because it had been tested at 20/200. DOTD also asserts that, had plaintiff not had such a serious vision impairment and had he been properly paying attention, he would have seen the Roadrunner, or at least the Roadrunner's arrow board, in plenty of time to make a safe, successful lane change.
On the other hand, Plaintiff sought to convince the jury exactly the opposite i.e., that DOTD's conduct was unreasonable under the circumstances and his conduct was reasonable. On the issue of the unreasonableness of DOTD's conduct, plaintiff asserted, primarily through the testimony of Gillen, that the procedures followed by Broussard were inadequate to properly warn motorists of the vehicle stopped in the travel portion of the bridge. In support of this theory, Gillen testified that both the standards set forth in the MUTCD and the DOTD handbook require the use of at least two vehicles for a debris pick-up operation, a work vehicle and a protection vehicle, and that DOTD's decision to allow Broussard to stop a single vehicle in the travel lane, without providing other warning signals, was both improper under the applicable standards and unreasonable under the circumstances. According to Gillen, the more warning devices used, the better the redundancy and conspicuity. Further, Gillen testified that Broussard's decision to stop the Roadrunner in the middle of the area where the rods were located was a violation of DOTD handbook,[3] as was his decision to try to wave traffic over with his finger or hand, instead of using a regulation 24 by 24-inch flag. Plaintiff also presented Broussard's testimony that he had only seen the DOTD *547 handbook on one occasion, during a training class, and that he had never again looked at the handbook, although he had been told that he needed to familiarize himself with the handbook before going out on the Roadrunner. On the issue of the reasonableness of his own conduct, plaintiff sought to convince the jury that he was driving at a safe speed and at a safe distance behind the white sedan, and that his vision impairment did not cause the accident because only his visual acuityi.e., his ability to distinguish between fine characterswas compromised, and that seeing the arrow board did not require visual acuity.
DOTD also sought to convince the jury that any failure to follow the standards set forth in the MUTCD and the DOTD handbook on its part did not cause the accident. In support of this argument, Mounce testified that having two vehicles on the scene would not have prevented the accident because plaintiff would have simply struck the first of the two vehicles he had come upon. Gillen testified however that having two vehicles would have greatly increased the probability that plaintiff would have seen the vehicles in time to make a safe, successful lane change because of the redundancy and conspicuity values of two vehicles, as opposed to one. Moreover, Gillen noted that the presence of two vehicles would necessarily have required the presence of two workers, one of whom could have been stationed farther down the bridge approach with a regulation warning flag to let motorists know about the need to change lanes.
As noted, the jury was presented with two opposing views of the cause of the accident that injured plaintiff. The jury's allocation of fault reveals that it actually chose a third viewi.e., that both the actions of DOTD and the actions of the plaintiff were unreasonable under the circumstances. The jury found that both parties were liable for the accident. The allocation of fault in this case reveals that neither the plaintiff's view of the evidence nor DOTD's view of the evidence was completely accepted by the jury. Following our review of the record evidence, we find no manifest error in the jury's finding that plaintiff's accident was caused in part by DOTD's breach of a duty it owed to plaintiff. Accordingly, the jury's decision to impose liability on the DOTD is not manifestly erroneous and that decision is hereby affirmed.

ALLOCATION OF FAULT
In its fifth and final assignment of error, DOTD asserts that the jury was manifestly erroneous in its allocation of fault between the parties. DOTD urges this court to reallocate fault to impose 100 percent of the fault on plaintiff. Alternatively, in the event this court finds, as it has, that the jury's decision to impose some of the liability for the accident on DOTD was not manifestly erroneous, DOTD asserts that no more than 10 percent fault should be allotted to DOTD.
In applying the manifest error standard to the factfinder's allocation of fault in Petre v. State ex rel. Dept. of Transp. and Development, XXXX-XXXX (La.4/3/02), 817 So.2d 1107, this court stated as follows:
Whether or not we agree with the equal allocation of fault between Ms. Petre and DOTD, we find it difficult, if not impossible, to conclude that the district court's reasoning was manifestly erroneous. In analyzing the allocation of fault of the parties, the court of appeal correctly applied the manifest error standard. Furthermore, the court of appeal was correct in applying the Watson [v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967, 974 (La. 1985) ] factors, which include the following: *548 1) whether the conduct results from inadvertence or involved an awareness of the danger; 2) how great a risk was created by the conduct; 3) the significance of what was sought by the conduct; 4) the capacities of the actor, whether superior or inferior; and 5) any extenuating circumstances that might require the actor to proceed in haste, without proper thought.
Id. at 13, 817 So.2d at 1114-15.
In this case, the court of appeal failed to expressly consider each of the factors set forth in Watson, 469 So.2d at 974. Nevertheless, our application of those standards convinces us that the court of appeal correctly affirmed the jury's allocation of 55 percent of the fault to DOTD. Concerning the first Watson factori.e., whether the conduct results from inadvertence or involved an awareness of the danger, Gillen repeatedly testified that debris pickup was a "planned" incident because the DOTD knew that it would frequently be required to pick up debris from the interstate as revealed by the fact that DOTD assigned an employee to the Roadrunner each day for the sole purpose of having him drive around the interstate and pick up debris. Further, Mr. Gillen indicated, DOTD was aware of the risk it created by stopping a vehicle in a travel lane, while plaintiff's conduct was completely inadvertent. Concerning the second Watson factori.e., how great a risk was created by the conduct, Gillen testified that DOTD's decision to allow the Roadrunner operator to stop a vehicle in the travel lane of the interstate without requiring the use of a second vehicle, or even some other type of warning device, in addition to the single arrow board, involved a great risk of harm, while plaintiff was simply driving in a prudent and safe manner when he suddenly and unexpectedly confronted an emergency situation created by the DOTD's imprudent actions.
Concerning the third Watson factor i.e., the significance of what was being sought by the conduct, plaintiff presented the testimony of Officers Caruso and Browning that they did not consider the presence of the metal rods to present an emergency situation because they were not located in travel lanes of the bridge, but instead were located to the side of the roadway, close to the concrete barrier. Although the plaintiff did not dispute the significance of debris pickup in general, he did suggest that DOTD improperly treated the incident involved in this case as an emergency, as a result of which the debris pickup was conducted without proper safety considerations and at an inopportune timei.e., rush hour. Gillen testified that debris pick-up is a pre-planned response and suggested that it should be done during off-peak hours, unless an emergency demands immediate action. Concerning the fourth Watson factori.e., the capacities of the actor, whether superior or inferior, the record evidence established that the DOTD, a state agency with the power and authority to close traffic lanes, had the superior capacity to prevent the accident by taking the necessary precautions mandated by the applicable standards set forth in the MUTCD and the DOTD handbook. Finally, concerning the fifth Watson factor i.e., any extenuating circumstances that might require the actor to proceed in haste, as explained above, plaintiff disputed DOTD's assertion that the presence of the metal rods created an emergency that required it to act in haste. And, regarding the plaintiff, he testified that he was not in a hurry.
Our review of the record evidence reveals no manifest error in the jury's decision to allot 55 percent of the fault for the accident to the DOTD. Accordingly, that decision is hereby affirmed.

*549 DECREE
We affirm the judgment of the court of appeal on the liability portion of the bifurcated trial finding DOTD 55 percent at fault for the plaintiff's accident. The case is remanded to the district court for trial of the second of the bifurcated phases, i.e., the damages suffered by plaintiff.
AFFIRMED.
VICTORY, J., dissents and assigns reasons.
TRAYLOR, J., dissents for the reasons assigned by VICTORY, J.
VICTORY, J., dissenting.
I dissent from the majority opinion because, in my view, the jury's decision imposing liability on the DOTD was manifestly erroneous. Even if the DOTD had used two vehicles for this emergency pick-up operation, as the plaintiff's expert contended was required under the MUTCD standards, the accident would not have been prevented because plaintiff would have simply struck the first of the two vehicles.
Therefore, I respectfully dissent.
PER CURIAM.
We grant rehearing in this case for the sole purpose of withdrawing our order remanding the case to the district court for determination of damages. Damages were previously determined, immediately following the trial on liability, through binding arbitration on agreement of the parties. Otherwise, the application for rehearing filed by the State is denied.
NOTES
[1] Although the testimony at trial indicated that the rods were concrete rebar rods measuring between six and seven inches in length, the rod included among the exhibits in this case was approximately one-quarter to one-half inch in circumference and 24 inches long. It was initially reported that a "crate of nails" had been dropped on the bridge.
[2] Some testimony at trial indicated that the rods were actually not located in the travel lanes of the bridge, but were located to the sides, near the concrete barriers.
[3] DOTD's expert, Mounce, admitted that the DOTD handbook required that the Roadrunner be stopped before the rods, for the safety of the workman picking up the rods.