NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 18-40

CHELSEA MACE

VERSUS

SHERMAN TURNER, ET AL.

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 253,260
HONORABLE PATRICIA EVANS KOCH, DISTRICT JUDGE

**********

**D. KENT SAVOIE**
**JUDGE**

**********

Court composed of John E. Conery, D. Kent Savoie, and Candyce G. Perret, Judges.

**AFFIRMED.**

**Brian M. Caubarreaux**
**Emily Gremillion**
**Eugene Ledet**
**Wesley K. Elmer**
**Brian Caubarreaux & Associates**
**144 West Tunica Drive**
**PO Box 129**
**Marksville, LA 71351**
**(318) 253-0900**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Chelsea Mace**

**S. Daniel Meeks**
**Laurence R. DeBuys, IV**
**Phyllis E. Glazer**
**Kristen E. Meeks**
**Meeks and Associates, L.L.C.**
**3401 West Esplanade Avenue, South, Suite 3**
**Metairie, LA 70002**
**(504) 355-0020**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
     **Ace American Insurance Company**
     **AAA Cooper Transportation**
     **Sherman Turner**

**SAVOIE, Judge.**

Plaintiff Chelsea Mace appeals the trial court's judgment dismissing her claims against Defendants following the jury's finding of no fault on the part of the Defendant driver, Sherman Turner. For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

This case arises out of an alleged auto accident that occurred on April 22, 2015, between Plaintiff, Chelsea Mace, and Defendant, Sherman Turner. On that date, Mr. Turner was driving an 18-wheeler owned by his employer, AAA Cooper Transportation, and he was making a delivery in the course and scope of his employment. He was driving on Masonic Drive in Alexandria, Louisiana, when he mistakenly passed by the business to which he was supposed to make a delivery. He therefore turned right onto Bacon Street so that he could back the 18-wheeler into another business's parking lot and turn it around.

Meanwhile, Ms. Mace was driving a Dodge Nitro on Masonic Drive and turned right onto Bacon Street. According to Ms. Mace, after she turned onto Bacon Street, she saw the stopped 18-wheeler, and she stopped her vehicle five feet behind it. She alleges that while she was stopped, Mr. Turner began reversing the 18-wheeler and that the 18-wheeler ran into her Dodge Nitro. She alleges that as a result of this accident, she suffered injuries to her lower back and her treating physician has recommended a lumbar fusion to correct those injuries.

On August 16, 2016, Ms. Mace filed a motion for summary judgment on the issue of liability. Thereafter, she also filed several evidentiary motions, including a motion in limine filed on September 12, 2016, which sought to exclude any evidence suggesting that there was no contact between the 18-wheeler and Dodge Nitro. In support thereof, she alleged that there was a judicial confession on the issue of contact in Defendants' Answer. Ms. Mace also filed a motion in limine

seeking to preclude testimony from Defendants' expert witness, Dr. Joseph Peles, an accident reconstructionist and biomechanical engineer. A hearing on those motions was held March 6, 2017, wherein the trial judge denied Plaintiff's motions, but ordered that "Plaintiff may present evidence of any responsive pleadings in the Defendants' Answer[,]" and "Dr. Peles shall be prohibited from testifying regarding opinions not consistent with his affidavit . . . of August 26, 2016[,] and his deposition testimony of September 13, 2016." The trial court also denied Ms. Mace's motion for summary judgment.

A jury trial was held March 21, 2017. Thereafter, the jury returned a verdict form reflecting its finding that Mr. Turner was not "at fault in causing this incident." A judgment dismissing Ms. Mace's claims was signed on April 5, 2017. Thereafter, Ms. Mace filed a motion for new trial and an alternative motion for JNOV, both of which were denied. Ms. Mace now appeals and asserts the following as assignments of error:

1. [The] Trial Court Ignored [D]efendant's Judicial Confession which ultimately tainted the verdict[.]

2. [The] Trial Court improperly allowed reconstruction and biomechanical testimony of Joseph Peles which tainted the verdict[.]

3. [The] Jury's finding of no fault on the part of the defendant-driver was error[.]

4. [The] Jury Erred in Not Awarding Plaintiff General and Special Damages[.]

## ANALYSIS

*Judicial Confession*

In her first assignment of error, Ms. Mace challenges the trial court's denial of her motion in limine seeking to preclude evidence indicating that there was no

2

contact between the parties' vehicles. She argues that Defendants' Answer constitutes a judicial confession on the issue.[1]

Paragraph five of Ms. Mace's petition alleged the following:

At approximately, 12:50 p.m., defendant-driver, SHERMAN TURNER, stopped in the middle of the roadway and proceeded in reverse attempting to back into the driveway of a business when suddenly, violently, and without warning, he struck the Mace Vehicle causing the subject motor vehicle accident.

In response, Defendants filed an answer on August 17, 2015, which included the following statement:

As to the allegations set forth in Paragraph 5 of the Petition for Damages of Plaintiff, it is admitted the 2006 Volvo Truck being operated by Turner contacted the front of the 2005 Dodge Nitro being operated by Plaintiff. All remaining allegations set forth in Paragraph 5 of the Petition for Damages of Plaintiff are denied.

Defendants' answer was signed by counsel, and no verification affidavit signed by the Defendants was attached.

As stated in *Mitchell v. Artcrete, Inc.*, 09-492, pp. 7-8 (La.App. 3 Cir. 12/9/09), 24 So.3d 1000, 1005:

Louisiana Civil Code Article 1853 defines a judicial confession as "a declaration made by a party in a judicial proceeding." Louisiana Civil Code Article 1853 further provides that a judicial confession "constitutes full proof against the party who made it" and that it "is indivisible and it may be revoked only on the ground of error of fact." Once a judicial confession is made by a party, it "has the effect of waiving evidence as to the subject of the admission – of withdrawing the subject matter of the confession from issue." *Cichirillo v. Avondale Indus., Inc.*, 04-2894, p. 6 (La.11/29/05), 917 So.2d 424, 429 (citing *Cheatham v. City of New Orleans*, 378 So.2d 369 (La.1979); *Sutton's Steel & Supply, Inc. v. Bellsouth Mobility, Inc.*, 00-511 (La.App. 3 Cir. 12/13/00), 776 So.2d 589, *writ denied*, 01-152 (La. 3/16/01), 787 So.2d 316). A judicial confession by a party, however, does not preclude that party from denying the correctness of the admission, unless the party claiming the benefit from the

_____

[1] We note that it is unclear whether the jury considered the issue of contact in connection with its verdict. The question of contact was not submitted to the jury on the jury verdict form, over the objection of Defendants. Rather, the first question presented on the jury verdict form was: "Do you find SHERMAN TURNER to be at fault in causing this incident?" In addition, the trial court's instructions to the jury regarding fault did not include the issue of contact, but rather whether how a reasonably prudent man would have acted in similar circumstances.

3

admission has relied on the admission to his prejudice. *Crawford v. Deshotels*, 359 So.2d 118 (La.1978).

As this court explained in *Leday v. Safeway Ins. Co. of La.*, 04-610, pp. 5-6 (La.App. 3 Cir. 11/17/04), 888 So.2d 1084, 1088:

> A judicial confession under La.Civ.Code art. 1853 constitutes incontrovertible evidence of a particular issue and serves to waive the necessity of any further proof on that issue. *Ramelow v. Bd. of Trustees of the [Univ.] of Louisiana System*, 03-1131 (La.App. 3 Cir. 3/31/04), 870 So.2d 415, *writ denied*, 04-1042 (La. 6/18/04), 888 So.2d 184; *C.T. Traina, Inc. v. Sunshine Plaza, Inc.*, 03-1003 (La. 12/3/03), 861 So.2d 156. In order for a party's statement to constitute a judicial confession, it must be an express acknowledgment of an adverse fact. *Jones v. Gillen*, 564 So.2d 1274 (La.App. 5 Cir. 1990); *Sanders v. Earnest*, 34,656 (La.App. 2 Cir. 7/24/01), 793 So.2d 393; *State v. Lamb*, 31,919 (La.App. 2 Cir. 5/7/99), 732 So.2d 1270. Additionally, "the adverse party must have believed the fact was no longer at issue or must have relied on it, to his detriment." *Lamb*, 732 So.2d at 1272; *Alexis v. [Metro.] Life [Ins.] Co.*, 604 So.2d 581 (La.1992); *Jefferson Parish v. [Fid.] & Deposit Co.*, 95-951 (La.App. 5 Cir. 4/30/96), 673 So.2d 1238; *Jones*, 564 So.2d 1274.

In the instant matter, after Defendants filed their answer, a jury trial was initially set for October 18, 2016. The parties filed their respective lists of witnesses and exhibits in accordance with the trial court's scheduling order. On August 16, 2016, Ms. Mace filed a motion for summary judgment arguing that Defendants were solely liable and "[t]he defendant did not uphold his heightened duty of care as a driver reversing on the highway[.]" In support of her position that the 18-wheeler struck the front fender of her vehicle, Ms. Mace cited to Mr. Turner's deposition testimony, including his response to counsel's question concerning when he realized that he had made contact with another vehicle. Mr. Turner's response was, "Actually, I didn't know. I felt a bump, but I didn't see anything behind me." Ms. Mace did not attach, or otherwise refer to Defendants' answer in connection with the August 16, 2016 motion.

4

On August 25, 2016, Ms. Mace filed a Motion in Limine seeking to exclude various evidence. This motion did not address evidence concerning contact between the vehicles or otherwise mention Defendants' Answer.

Defendants filed their pre-trial memorandum on August 29, 2016, wherein they stated:

> It is disputed whether any contact at all was made between the rear of the ACT Tractor-Trailer and the front of the [Dodge] Nitro. Photographs of the front of the Nitro do not show any damage, and the Plaintiff testified in deposition there was no damage or repairs made to the Nitro as a result of the alleged contact.

On September 8, 2016, Ms. Mace filed a supplemental motion for summary judgment on liability "to include in additional [sic] to the exhibits initially filed in support of her summary judgment . . . Defendant's Answer to the Petition for Damages." On that same day, Ms. Mace also filed a Supplemental Motion in Limine seeking to exclude evidence suggesting that contact between Mr. Turner's and Ms. Mace's vehicles did not occur.

Upon review of the record, we conclude that the trial court did not err in denying Ms. Mace's motion in limine pertaining to evidence of contact between the vehicles. There is no indication that Ms. Mace detrimentally relied on Defendants' statement regarding contact in their Answer. Rather, Ms. Mace's counsel raised the issue of contact when questioning Mr. Turner during his deposition, and Mr. Turner refused to admit contact occurred. In addition, Ms. Mace did not initially rely on Defendants' answer in support of her motion for summary judgment filed August 16, 2016, or otherwise prior to Defendants expressly raising the issue of contact in their August 29, 2016 pre-trial memorandum filed in accordance with the trial court's scheduling order. We further note that the trial judge's ruling expressly permitted Ms. Mace to submit

5

Defendants' Answer to the jury for consideration.[2]  Therefore, we affirm the trial court's denial of Ms. Mace's motion in limine in connection with evidence of contact between the vehicles at issue.

*Expert Testimony*

In her second assignment of error, Ms. Mace seeks review of the trial court's denial of her "Daubert Challenge of Joseph Peles, PH.D And Motion In Limine to Exclude Joseph Peles, PH.D." Defendants retained Dr. Peles as a proposed expert in accident reconstruction and biomechanical engineering.

Louisiana Code of Evidence Article 702, which governs the admissibility of expert testimony, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert has reliably applied the principles and methods to the facts of the case.

As stated in *State v. Eaglin*, 17-657, pp. 3-4 (La.App. 3 Cir. 3/28/18), 239 So.3d 1001, 1007-1008:

> *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*], 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 [(1993)], "set forth a means for determining reliability of expert scientific testimony and answered many questions as to proper standards for admissibility of expert testimony." [*State v.*] *Foret*, 628 So.2d [1116,]1121 [(La. 1993)]. When considering reliability, the trial court should first perform "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that

---

[2] Plaintiff did not submit Defendants' Answer as an exhibit at trial, or otherwise question Mr. Turner about the responses made therein.

reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93, 113 S.Ct. 2786. Illustrative, not exclusive, factors bearing on that assessment include whether the theory or technique can be and has been tested, whether it has been subjected to peer review and publication, "the known or potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation," and general acceptance of the theory or technique in the scientific community. *Id.* at 594, 113 S.Ct. 2786. This gatekeeping function "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire*[*, Ltd. V. Carmichael*], 526 U.S. [137,]141, 119 S.Ct. 1167 [(1999)]. The inquiry must be applied to the facts of each particular case. *Id.*

Our supreme court adopted a three-part inquiry to determine the admissibility of expert testimony in *Cheairs v. State ex rel. Department of Transportation & Development*, 03-680 (La. 12/3/03), 861 So.2d 536. Quoting from the Eleventh Circuit's opinion in *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir.1998), *cert. denied*, 528 U.S. 812, 120 S.Ct. 309, 145 L.Ed.2d 42, and *cert. denied*, 528 U.S. 812, 120 S.Ct. 47, 145 L.Ed.2d 42 (1999), the court held expert testimony is proper when:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Cheairs*, 861 So.2d at 542. The *Daubert* evaluation applies to the second of these prongs. *Id.*

"A district court's decision to qualify an expert will not be overturned absent an abuse of discretion." *Cheairs v. State ex rel. Dept. of Transp. & Dev.*, 03-680, p. 6 (La. 12/3/03), 861 So.2d 536, 541.

The *Daubert* hearing as to Dr. Peles was held on March 6, 2017. Mr. Peles was called to testify, his affidavits and reports attached to Defendants' opposition were admitted into evidence, and he was thoroughly examined and cross-examined by counsel.

7

Dr. Peles explained his extensive educational and professional background concerning accident reconstruction and biomechanical engineering. He indicated that he was retained to complete an accident reconstruction to determine "the potential for Ms. Mace to recognize the tractor-trailer and stop at a distance of greater than five feet," meaning, given her "perception reaction time to recognize the tractor-trailer ahead of her, could she have stopped closer – or farther away tha[n] five feet, and that would have provided more room for the tractor-trailer to back up."

Dr. Peles testified that he went to the site after the accident and conducted a blind-spot analysis using an exemplar 18-wheeler with the same size trailer as the one driven by Mr. Turner, and a Honda Civic similar in size to the Dodge Nitro. The Honda was 5.8 feet wide and 14.8 feet long, whereas the Dodge Nitro was 6.1 feet wide and 14.9 feet long. Dr. Peles indicated that based upon Ms. Mace's deposition testimony indicating she stopped five-feet behind the 18-wheeler, he positioned the exemplar Honda five-feet behind the exemplar18-wheeler, and that at this distance, he could not see the Honda while in the cab of the 18-wheeler. He further explained that the minor differences in size between the Honda and the Dodge would not have any impact on visibility at five feet behind the 18-wheeler.

Dr. Peles further concluded that when taking into consideration a perception-reaction time for Ms. Mace to recognize the 18-wheeler in front of her after she turned onto Bacon Street, Ms. Mace would have been able to stop more than five feet behind the 18-wheeler. He explained his calculations and measurements leading to that conclusion.

Dr. Peles testified that he was also asked to "one, describe the severity level experienced by the Dodge. Number two, describe how a driver within the Dodge would move, the forces that would be applied to the low back, and also whether or

8

not those motions and forces are likely above tolerance data." He explained that in conformity with published and accepted methods and formulas, he first considered the damage incurred by Ms. Mace's vehicle, and based upon the damage, and the published "stiffness" of the vehicle, he was able to determine the impact speed of the 18-wheeler and the change in velocity of Ms. Mace's vehicle. He then considered the effects of that change in velocity on the body and the body's tolerance of those effects.

Dr. Peles testified that, for purposes of his analysis, he assumed that there was contact between the vehicles and structural damage to the bumper of Ms. Mace's vehicle, even though the evidence provided to him, including Ms. Mace's deposition testimony, did not indicate that any such damage occurred. He further explained that in his calculations, he used the "curb weight" of Ms. Mace's Dodge and added to that Ms. Mace's weight reported in her medical records, and an estimated weight for Ms. Mace's female passenger based on average weights of women of the same age. Dr. Peles further assumed the weight of Mr. Turner's 18-wheeler to be an "infinite mass", or a "barrier", since it significantly outweighed Ms. Mace's vehicle. He then calculated the estimated impact speed as 3.75 miles-per-hour and a resultant 4 mile-per-hour change in velocity in Ms. Mace's vehicle using the generally accepted formulas. Dr. Peles made clear that given the assumed damage to Ms. Mace's vehicle and infinite mass of the 18-wheeler, his change in velocity calculation was the upper limit.

Using the change in velocity, Dr. Peles then analyzed the occupant dynamics, which he explained as:

> looking at how a driver in the Dodge would move . . . . And the mechanism of injury to the low back is compression. So we're interested in looking at the extent of compression that would be applied to the low back. And I was also interested in how comparing

9

that level of compression to other activities that would be similar or higher compression levels.

Dr. Peles then explained that low back compression is measured in kilonewtons and that to determine the compression in this case, he referred to published crash test data within the range of the subject change in velocity. He further testified in detail concerning the crash test data sources he relied upon in his analysis and confirmed that the methodology he utilized in determining forces on a vehicle occupant's spine was peer reviewed, tested, and accepted. Dr. Peles concluded that the maximum compression to Ms. Mace's spine in connection with the subject incident was less than .78 kilonewtons, based upon the change in velocity, her weight, and the relied upon crash test data.

Dr. Peles then testified that:

given this maximum likely compression that would be experienced on the spine in an accident like this, I did two different things. Number one, I looked at the levels of comparison during different daily activities. There's actually been research where a group has implanted a pressure transducer in a live human being and had this gentleman perform tasks of daily living and they can measure the changes in his low back discs while he's doing this. And that could be used to determine the force levels involved in doing that. And we can compare that to the crash test data. And what this research shows is that activities like standing from a chair . . . produce greater compression levels on the low back than an accident of this nature. . . . The second thing I did was look at our compression level compared to tolerance data that's out there. And tolerance data is typically from cadaver testing. And there's been extensive research done by the Adams group . . . where they have tested cadavers over a range of degenerative levels, of pre-existing degenerative levels, to determine the extent of compression needed to produce disc injury. . . . And their range was from anywhere from 2.8 to 13 kilonewtons. We're at less than .78 so we're below that range.

When asked on cross examination if he was going to testify as to whether or not Ms. Mace was injured in the accident, Dr. Peles stated "I believe that's more up to the jury to decide but I believe I can provide information that could help them make their decision." He further indicated that he would explain to a jury

"that those forces were below tolerance for a structural injury. At maximum, a person may be expected to have transient muscle pain from an accident like this[,]" and "[f]or this accident I would say there's not a mechanism to produce [Ms. Mace's injury]. So I can do my calculations in my biomechanics."

On appeal, Ms. Mace argues that Dr. "Peles's calculations, assumptions and opinions were erroneous and should have never been allowed before the jury." She lists various purported errors in the data Dr. Peles utilized in his analysis and calculations, such as the weights of the vehicles and the damage he assumed occurred to Ms. Mace's vehicle.

However, "there is a crucial difference between questioning the methodology employed by an expert witness, and questioning the application of that methodology or the ultimate conclusions derived from that application. Only a question of the validity of the methodology employed brings *Daubert* into play." *Tadlock v. Taylor*, 02-712, pp. 4-5 (La.App. 4 Cir. 9/24/03), 857 So.2d 20, 26, *writ denied*, 03-3265 (La. 3/12/04), 869 So.2d 819. "The court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. As with all other admissible evidence, expert testimony is subject to being tested by 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* (internal citations omitted). We therefore find no abuse of discretion on the part of the trial court in allowing issues concerning the correctness or validity of the data Dr. Peles utilized in his calculations to be presented to the jury.

Ms. Mace also suggests that Dr. Peles should have, but failed to, take into consideration certain data or facts in connection with his calculations and analysis, such as whether Ms. Mace applied the brake after impact, any extent to which Ms. Mace's vehicle was pushed back by the 18-wheeler, and any damage sustained by

the 18-wheeler. She also takes issue with the use of exemplar vehicles when Dr. Peles inspected the scene of the alleged accident and conducted a demonstrative blind-spot analysis. However, she does not cite to any evidence in the record suggesting that this information should have been utilized in Dr. Peles's methodology and analysis, or that any other methodologies should have been utilized. Therefore, we reject this argument.

Ms. Mace also argues that Dr. Peles was impermissibly allowed to testify on the issue of causation of Ms. Mace's injuries. She relies primarily on *Godchaux v. Peerless Ins. Co.*, 13-1083 (La.App. 3 Cir. 6/4/14), 140 So.3d 817, *writ denied*, 14-1411 (La. 10/3/14), 149 So.3d 801, in support of her argument that force-of-impact testimony cannot be considered in connection with the issue of causation of injuries. However, the jury in the instant matter did not reach the issue of causation, given that it found no fault on the part of Mr. Turner. Therefore, we do not address this argument.

We affirm the trial court's denial of Ms. Mace's *Daubert* challenge and motion in limine with respect to Dr. Peles's expert testimony.

### *Fault and Damages*

Ms. Mace suggests that because the trial court erroneously denied her evidentiary motions seeking to exclude evidence of whether or not there was contact between the parties' vehicles and expert testimony by Dr. Peles, we should conduct a *de novo* review of the merits. However, as reflected above, we find no error in the trial court's evidentiary rulings at issue herein. Therefore, we review the jury's finding of no fault on the part of Mr. Turner and the resultant dismissal of Ms. Mace's claims for manifest error. *Rossell v. ESCO*, 549 So.2d 840 (La.1989).

Ms. Mace testified that she stopped her vehicle five feet behind Mr. Turner's 18-wheeler. Defendants presented evidence that Ms. Mace would have been able to stop further than five feet behind the 18-wheeler, as well as evidence indicating that Mr. Turner would not have been able to see Ms. Mace behind him at this distance. Ms. Mace did not present a conflicting demonstrative blind-spot analysis or any other evidence on these issues. Therefore, we find that the record supports the jury's finding regarding fault, and we affirm the trial court's judgment in this matter.

## DECREE

For the reasons set forth above, we affirm the trial court's judgment dismissing Plaintiff-Appellant Chelsea Mace's claims against Defendants in this matter. Costs of this appeal are assessed to Ms. Mace.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.