STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-506

BENTON SPECIALTIES, INC., ET AL.

VERSUS

CAJUN WELL SERVICE, INC., ET AL.

************

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 68,530
HONORABLE LORI A. LANDRY, DISTRICT JUDGE

************

DAVID E. CHATELAIN[*]
JUDGE

************

Court composed of Sylvia R. Cooks, Oswald A. Decuir, Jimmie C. Peters, Shannon J. Gremillion, and David E. Chatelain, Judges.

Gremillion, J., dissents and assigns written reasons.

REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.

Stan Gauthier, II
Nichole Laborde Romero
Attorneys at Law
1405 West Pinhook Road, Suite 105
Lafayette, Louisiana 70503
(337) 234-0099
Counsel for Defendant/Appellant:
    Cajun Well Service, Inc.

_____

[*]Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Susan Nations**
**Juneau Law firm**
**Post Office Drawer 51268**
**Lafayette, Louisiana  70505**
**(337) 269-0052**
**Counsel for Plaintiffs/Appellees:**
    **Lexington Insurance Company**
    **Benton Specialties, Inc.**

**Jonathan C. Augustine**
**The Augustine Firm, APLC**
**8322 One Calais Avenue**
**Baton Rouge, Louisiana  70809**
**(225) 715-7112**
**Counsel for Defendant/Appellee:**
    **Petrosurance Casualty Company**

**CHATELAIN, Judge Pro Tempore.**

This concursus proceeding involves the disbursement of funds recovered by a workers' compensation insurer via intervention in the third-party tort litigation of its insured's employee. The insured employer appeals the trial court's award of the concursus funds to the insurer and denial of its request for sanctions and award of attorney fees against insurer's counsel. For the following reasons, the judgment of the trial court is reversed in part, affirmed in part, and rendered.

### *Facts and Procedural Background*

In 1995, Cajun Well Service, Inc. (Cajun) contracted with Petrosurance Casualty Company (Petrosurance) for workers' compensation coverage. The term of the policy issued by Petrosurance was November 25, 1995, through November 25, 1998, but with one year renewals. The policy included a retrospective premium endorsement which provided for a one-year retrospective rating plan. A retrospective rating plan provides for the calculation of the insured's premium *after* the conclusion of the policy period. One factor included in the final premium calculation is claims paid by the insurer. If no claims are made, the insured's premium is less than it would have been for a standard policy.

On January 24, 1996, Cajun's employee, Warren Malveaux, sustained a work injury. Mr. Malveaux filed a third-party tort action to recover damages for his injury, and Petrosurance intervened in the action to recover workers' compensation benefits it had paid with regard to Mr. Malveaux's injury. In January 2004, Mr. Malveaux and Petrosurance agreed to settle their claims against the tortfeasor and its insurer. Petrosurance had paid \$118,000[1] in medical and indemnity benefits to Mr. Malveaux;

---

[1]For ease of reading and calculations, dollar amounts referenced in our discussion have been rounded up or down to the nearest dollar, as this methodology was utilized by Petrosurance in its

1

it accepted $59,000 (the funds) in settlement of its claim. Cajun claimed it was entitled to the funds, and the tortfeasor and its insurer instituted a concursus proceeding, naming Cajun and Petrosurance as defendants and depositing the funds into the registry of the court.

In 2005, Petrosurance filed a motion for summary judgment, seeking a judgment awarding it the funds. The basis of its claim was a subrogation clause contained in the policy. The trial court granted judgment as requested, and Cajun appealed. This court reversed the trial court's judgment, holding:

> This is a case of first impression for this court. There are no cases that address the issue of retrospective premiums[,] and no clear language in the contract that addresses whether the insurance company is entitled to receive more in reimbursement than actually paid out of pocket. Cajun argues that Petrosurance was acting merely as an administrator in the payment of some of the benefits. This is a material issue of fact which precludes summary judgment. We reverse the judgment of the trial court and remand this matter for trial on the merits so that a clear determination may be made of the nature of the payments by Cajun to Petrosurance and so that a determination may be made as to whether Cajun is entitled to any reimbursement.

*Benton Specialties, Inc. v. Cajun Well Serv., Inc.*, 05-842, pp. 3-4 (La.App. 3 Cir. 2/1/06), 922 So.2d 687, 689.

On remand, Cajun hired an expert witness to provide the trial court with information as to the policy and Cajun's claim to the funds. Petrosurance sought to exclude the expert's testimony or, alternatively, to limit his testimony, arguing that the analysis the expert presented in his report included a legal analysis of the policy, which is within the purview of the court. The trial court denied Petrosurance's request to exclude Cajun's expert's testimony but limited the expert's testimony.

---

premium calculations without objection by Cajun.

2

After summary judgment was granted but before Cajun filed its suspensive appeal, the clerk of court disbursed the funds to counsel for Petrosurance. On receipt of the funds, counsel forwarded them to his client. Prior to trial, counsel for Cajun learned that Petrosurance had received the funds and issued a writ of sequestration to have the funds redeposited into the registry of the court. He then filed a motion for sanctions against counsel for Petrosurance, Petrosurance, an attorney who had assisted counsel by appearing at a deposition for him, and a law firm with which counsel became associated after the funds had been disbursed. Cajun also requested attorney fees for having to file a motion for sanctions to have the funds returned to the clerk of court.

In response to Cajun's rule for sanctions, Petrosurance filed a motion to dismiss, a motion to strike, peremptory exceptions of no cause of action and non-joinder of a party, and a dilatory exception of unauthorized use of a summary proceeding. It also filed a rule to show cause why sanctions should not be levied against Cajun's counsel.

Trial on the merits and these ancillary matters was held February 25, 2008. The trial court concluded that the subrogation provision of the policy entitled Petrosurance to the funds and awarded judgment in its favor. In a separate judgment, the trial court granted Petrosurance's motion to dismiss Cajun's request for sanctions and attorney fees but ordered counsel for Petrosurance to pay all costs associated with the writ of sequestration and Cajun's motions. Cajun's requests for relief and the remainder of Petrosurance's requests for relief were denied.

Cajun appealed both judgments. Petrosurance filed a motion to dismiss Cajun's appeal of the trial court's judgment denying its rule for sanctions on the bases

3

that it was an interlocutory judgment and that Cajun had not made a showing of irreparable harm. Another panel of this court determined that because a final, appealable judgment had been rendered on the merits, it was appropriate for the interlocutory judgment to be subject to appellate review with the judgment on the merits. *Benton Specialties, Inc. v. Cajun Well Serv., Inc.,* 09-506 (La.App. 3 Cir. 6/10/09), 13 So.3d 257. Accordingly, we address all of Cajun's assignments of error.

Cajun assigns error with the trial court's limitation of its expert's testimony, award of judgment in favor of Petrosurance, and denial of its request for sanctions and attorney fees.

### *Discussion*

Cajun's first two assignments of error pertain to Petrosurance's policy and raise an issue of interpretation; therefore, we begin our discussion with a review of the law regarding contract interpretation. An insurance contract is a conventional obligation that constitutes the law between the insured and insurer. *Peterson v. Schimek,* 98-1712 (La. 3/2/99), 729 So.2d 1024. Certain principles of construction guide the interpretation of contracts, and insurance contracts are interpreted in the same manner as other contracts. *Id*. Contracts must be read and construed as a whole. *Id.* "When the words of an insurance contract are clear and explicit and lead to no absurd consequences," the policy must be enforced "as written," and courts "may make no further interpretation in search of the parties' intent." *Id.* at 1028.

When a contract can be construed from the four corners of the document, contract interpretation is a question of law. *Sims v. Mulhearn Funeral Home, Inc.,* 07-54 (La. 5/22/07), 956 So.2d 583. Appellate review of a question of law is limited to determining whether the trial court's determination is legally correct or incorrect.

4

*CLK Co., L.L.C. v. CXY Energy, Inc.*, 07-834 (La.App. 3 Cir. 12/19/07), 972 So.2d 1280, *writs denied*, 08-140, 08-207 (La. 3/14/08), 977 So.2d 932, 937.

The trial court's determinations that Petrosurance is entitled to the funds and that Cajun's expert's testimony should be limited are based on the following provision of the policy:

Recovery from Others

We have your rights, and the rights of persons entitled to the benefits of this insurance, to recover our payments from anyone liable for the injury. You will do everything necessary to protect those rights for us and to help us enforce them.

The trial court concluded that the subrogation provision was clear and explicit and that Petrosurance had the right to enforce it as written. We agree. However, the trial court considered this provision in isolation and to the exclusion of other policy provisions and the evidence. For these reasons, we address Cajun's assignments of error in light of the entire policy and the evidence.

### *Entitlement to the Funds*

Cajun asserts that it is entitled to receive all the funds because the amounts it paid to Petrosurance were used to pay Mr. Malveaux's claims. Petrosurance relies on the policy's subrogation provision quoted above to defend the trial court's award of the funds to it.

Cajun contends that Petrosurance acted as a third-party administrator because Petrosurance used Cajun's money to pay Mr. Malveaux's claims and asserts that it is subrogated to the funds. Its argument is based on *Insurance Co. of North America v. Binnings Construction Co., Inc.,* 288 So.2d 359 (La.App. 4 Cir. 1974),

5

La.Civ.Code art. 1826,[2] its expert's testimony, and the $77,000 it paid to Petrosurance for indemnity benefits and medical expenses Petrosurance paid on Mr. Malveaux's claims.

*Binnings* did not hold that under a retrospective rating plan, the insurer is a third party administrator. Rather, the court in *Binnings* observed that because "insureds must . . . pay the insurer as increased premium for [payments] the insurer has made; . . . it *may be said* that, within those premium limits, the insurer [pays] claims not with its own money but with insureds' money." *Id.* at 360-61 (emphasis added). Additionally, subrogation may be legal or conventional. La.Civ.Code art. 1825. Here, it is conventional and governed by Petrosurance's policy, which is the law between the parties. Consequently, we must determine if any provision other than the subrogation provision affects who recovers the funds.

Petrosurance's defense of the trial court's judgment is based on the policy's subrogation provision and its calculation of a "final" premium before the funds were recovered. Kristine Williams, Petrosurance's representative, testified regarding the policy and the parties' claims to the funds. She testified that Petrosurance audited Cajun's payroll in January 1997 and that she used the audit to make a "final" premium calculation in 2000. According to the "final" premium calculation, Cajun

---

[2]Louisiana Civil Code Article 1826 provides:

A. When subrogation results from a person's performance of the obligation of another, that obligation subsists in favor of the person who performed it who may avail himself of the action and security of the original obligee against the obligor, but is extinguished for the original obligee.

B. An original obligee who has been paid only in part may exercise his right for the balance of the debt in preference to the new obligee. This right shall not be waived or altered if the original obligation arose from injuries sustained or loss occasioned by the original obligee as a result of the negligence or intentional conduct of the original obligor.

6

was due a refund because the premiums it paid exceeded the "final" premium she had calculated. Ms. Williams testified that the refund due Cajun had been mailed to it. During direct examination, Ms. Williams relied on the following policy provision for her claim that the 2000 premium calculation was "final":

> After a calculation of retrospective premium, you and we may agree that it is the final calculation. No other calculation will be made unless there is clerical error in the final calculation.

Ms. Williams admitted on cross-examination, however, that she did not see a document in Cajun's file which indicated the 2000 accounting was "final," and, although she testified immediately thereafter that the overpayment refund order was labeled "final," she admitted she had not seen that documentation during the trial. Ms. Williams also testified that, "there comes a point in time when the policy (not audible) froze out" and that because the funds were recovered years after her "final" calculation, they were not included therein. Counsel for Cajun continued pressing Ms. Williams about accounting for the funds in the premium calculation, and she admitted that if the funds had been recovered before the "final" accounting had been done "it would have been an issue."

Cajun's expert, Dr. William L. Ferguson, did not dispute any of Ms. Williams' testimony regarding the policy provisions, the premiums, or her calculations. He did testify, however, that he had not found evidence establishing Petrosurance had paid the premium refund due Cajun. He further testified that the policy had no set time to close, that it would not be closed until the parties agreed, and that he never saw a document evidencing that the policy was closed. Dr. Ferguson also testified that when a recovery is made under a retrospective premium policy it benefits the insured first and the insurer cannot keep any of the recovery until the insured is made whole.

7

Ms. Peggy Thibodeaux, Cajun's bookkeeper, also testified at trial; however, her testimony could not be transcribed due to a problem with the recording equipment in the courtroom. The trial court summarized her testimony and stated in its Reasons for Judgment that Ms. Thibodeaux testified she did not recall receiving the premium refund and that she did not testify about the terms of the policy. The trial court's summary of Ms. Thibodeaux's testimony is not disputed by the parties, and we accept it as being accurate.

Ms. Williams admitted that recovery of the funds would have affected the calculation of Cajun's premium but claimed it came too late because there had been a final calculation of the premium as provided in the policy. The policy provides in pertinent part:

> We will calculate the retrospective premium using all loss information we have as of a date six months after the rating plan period ends and annually thereafter. . . .
>
> . . . .
>
> After a calculation of retrospective premium, you and we may agree that it is the final calculation. No other calculation will be made unless there is clerical error in the final calculation.

These provisions provide for a premium calculation six months after the policy ended and annually thereafter, unless the parties agree otherwise. The only audit performed after the policy ended was in January 1997, approximately six weeks after the policy plan ended in November 1996. Ms. Williams testified that she performed the "final" calculation required by the policy in 2000, which resulted in Cajun being due a refund. However, she acknowledged that no document in evidence contains a calculation labeled "final." Further, she did not testify that Cajun agreed her 2000 premium calculation was "final" or that Petrosurance had proof Cajun received the

8

refund it was owed. Ms. Thibodeaux testified, contrary to Ms. Williams, that she did not recall receiving a refund from Petrosurance, and there is no evidence of such a refund in the record or that Cajun agreed the 2000 premium calculation was final.

Ms. Williams also claimed that the premium calculation she performed in 2000 was the final calculation because the funds were recovered many years after the policy terminated and the policy "froze out" before that time, indicating the premium calculation was finalized by the passage of time. No provision in the policy provides for this.

For these reasons, we find that the trial court's judgment awarding the funds to Petrosurance was legally incorrect and reverse it. Accordingly, we must now determine who is entitled to the funds.

Pursuant to the policy, the amount of Cajun's premium depends on five elements: 1) standard premium; 2) basic premium; 3) incurred losses; 4) converted losses; and 5) taxes. Pertinent to the resolution of the issue presented herein is incurred losses which is defined as: "all amounts we pay or estimate we will pay for losses, interest on judgements, expenses to recover against third parties, and employers liability loss adjustment expenses." Ms. Williams and Dr. Ferguson both testified that recovery of incurred losses through subrogation reduces the amount of incurred losses included in the premium calculation.

Petrosurance did not prove that a final reconciliation had been done and accepted by Cajun; therefore, we will calculate Cajun's final premium to account for the funds. Ms. Williams testified how the final calculation of Cajun's premium would be performed to account for the funds. According to the policy and Ms. Williams' testimony the formula for calculating Cajun's premium is:

9

> Basic premium (payroll x basic premium factor (.30))
>
> +      Converted losses (incurred losses x loss conversion factor (1.108))
>
> x      Tax factor (1.067)

Using this formula, we calculate Cajun's final premium as follows:

> $ 56,579   ($188,596[3] x .30)
>
> +     <u>82,939</u>   ($133,855 - 59,000 = (incurred losses) x 1.108)
>      $139,518
>
> x     <u>1.067</u>
>
> $148,866

Cajun paid premiums totaling $190,295, which exceeds the premium it owes by $41,429, and it is entitled to this portion of the funds. Petrosurance is entitled to $17,571, the difference between $59,000 and $41,429.

***Expert Witness Testimony***

Cajun asks this court to reverse the trial court's determination that its expert witness could not give his opinion as to how the policy should be interpreted, i.e., who is entitled to the funds. It proffered a copy of Dr. Ferguson's report to facilitate our review of this issue.

The trial court is allowed much discretion in determining whether to allow a witness to testify as an expert under La.Code Evid. art. 702, and its judgment will remain undisturbed unless that discretion was abused. *Cheairs v. State ex rel Dep't of Transp. & Dev.*, 03-680 (La. 12/2/03), 861 So.2d 536. The trial court did not err

---

[3]Ms. Williams calculated the premium as 30% of Cajun's payroll. The policy provides that the basic premium is 30% of the standard premium. Review of the January 1997 audit reveals that the payroll and standard premium are the same, as the original standard premium of $168,407 was revised to $188,596, as a result of the audit.

in holding that it is the court's province to interpret a contract, and we find no error with the trial court's ruling in this regard.

Pursuant to the trial court's ruling, Dr. Ferguson testified regarding industry standards, practices, and customs and that any subrogation recovery goes to the benefit of the insured, but he was not allowed to testify how recovery of the funds affected the calculation of Cajun's premium. We have reviewed Dr. Ferguson's report. The information and opinions contained therein are comparable to the testimony of Petrosurance's representative. Dr. Ferguson opined that Cajun's premium was reduced by recovery of the funds and outlined the process for calculating the premium. His premium calculation followed the process explained by Ms. Williams, i.e., it included incurred expenses as defined by the policy and a credit to Cajun in the amount of the funds. Therefore, we find that the trial court erred in refusing to allow Dr. Ferguson to testify regarding the effect the funds had on Cajun's premium.

We note, however, that Dr. Ferguson used $133,359 for incurred losses in his calculation, but Ms. Williams testified that the incurred losses were $133,855. According to Dr. Ferguson's report, the $133,359 figure included in his calculation was obtained from two documents attached to Petrosurance's memorandum in support of its motion for summary judgment. We have reviewed the documents attached to Petrosurance's memorandum; they appear to be the same documents Petrosurance introduced at trial. The documents include an itemization of payments made for Mr. Malveaux's claim and copies of cancelled checks representing those payments. The documents support Ms. Williams' testimony that incurred losses were $133,855. Accordingly, we used that figure in our calculation above.

11

*Sanctions*

Cajun urges that the trial court erred in denying its request that sanctions be imposed against counsel for Petrosurance and that he be ordered to pay attorney fees Cajun incurred to have the funds redeposited with the clerk of court. The trial court explained in its Reasons for Judgment that it determined sanctions were not appropriate because it found counsel for Petrosurance had "no intention to defraud this Court or opposing party" and attributed his actions to "overzealousness, as opposed to an intentional defrauding of the Court or opposing counsel." However, the trial court did order counsel for Petrosurance "to pay the cost of filing and hearing of the Rule for Sanctions, as it was based on his error." Cajun's request for attorney fees was refused because, as the trial court aptly observed, while Cajun's counsel was within his right to file the motion for sanctions, he did not take "the least costly course of action" of requesting a return of the funds before filing a motion.

A trial court's decision to grant or deny sanctions or attorney fees against an attorney will not be reversed unless it is manifestly erroneous. *Miller v. Miller*, 35,358 (La.App. 2 Cir. 12/5/01), 803 So.2d 292. We have reviewed the record and find the trial court's denial of Cajun's request for sanctions and attorney fees was not manifestly erroneous.

### Conclusion

The judgment of the trial court assigning the $59,000 deposited in the registry of the court plus interest to Petrosurance Casualty Company is reversed. The $59,000 deposited in the registry of the court is to be disbursed as follows: $41,429 plus interest to Cajun Well Service, Inc. and $17,571 plus interest to Petrosurance

12

Casualty Company.  The other judgments of the trial court are affirmed.  Costs are assessed to Petrosurance Casualty Company.

**REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.**

09-506 *Benton Specialties, Inc., et al. v. Cajun Well Service, Inc., et al.*

**GREMILLION, Judge, dissenting.**

This concursus proceeding involves the dispute between an insurer and its insured over entitlement to the money derived from a settlement negotiated by the insurer with a third party tortfeasor of the intervention filed by the insurer in its insured's employee's suit against the tortfeasor. The insured contested the insurer's subrogation and the tortfeasor deposited the proceeds into the registry of the court and invoked the concursus.

Cajun's policy was a retrospective premium policy, in which the insurer agreed to charge a discounted premium, but reserved the right to charge additional premiums during the policy term if claims were made. For instance, Cajun *would* have paid premiums of $168,307 under a traditional policy, but only paid $113,158 under the retrospective premium scheme. However, after Malveaux's claim, Petrosurance charged Cajun an additional $77,137 in retrospective premiums.

The majority concludes that the insured is entitled to $41,429 and the insurer is entitled to $17,571. It achieves this result by recalculating the retrospective premium. The recalculating of the premium is unwarranted, and does great violence to the policy language.

The policy language here is clear and unambiguous. The premium the insured owed was to be calculated using the loss information available as of six months after the rating plan period ends and annually thereafter. The recovery of this settlement in Malveaux's case—which I again emphasize was achieved solely through the

efforts of the insurer—occurred well after the rating plan period and should not have been used at all in calculating the premium.

The majority bypasses this provision by concluding that there was no "freeze out" period in the policy and by pointing out as evidence that the premium calculation was never "final" the fact that the insurer looked back over the plan and may have given a refund to the insured four years after the fact. This is a classic example of no good deed going unpunished. This, in my opinion, does not reopen the premium calculation because no new information was used by the insurer in determining that it owed a refund to the insured, whereas the recovery of the settlement by the insurer clearly constitutes new information not available as of six months after the rate plan period. The policy did indeed contain a "freeze out" provision: the premium was to be based on the information available as of six months after the rating plan period.

The insurer prosecuted the intervention to recover the lien and settled the lien at its expense by virtue of the subrogation provision. While recognizing the existence of the subrogation provision, the opinion effectively writes it out of the policy.

I would also point out that during the period for which Cajun was charged the retroactive premium, Petrosurance was exposed to the prospect of additional claims. Although it was fortunate for all that no additional claims arose, the fact remains that Petrosurance was forced to factor the potential for additional claims into its business decisions. Had additional claims arisen, Petrosurance would have covered them; and under its contract, no additional premiums could have been charged, as the policy capped the retrospective premium at the amount Cajun was charged as a result of Malveaux's claim. Petrosurance would have been forced to honor this arrangement, and Cajun would have had no reason to complain. Yet, under the one hypothetical such an arrangement could have inured to the benefit of Petrosurance, the majority

does not require Cajun to honor its commitment. Cajun was not forced to purchase a retrospective premium policy. It negotiated the terms of the policy with the anticipation that it would result in substantial savings. This was a calculated business decision. Its miscalculation should not result in a decision that completely abrogates the language of the policy.

I respectfully dissent.