| ARTHUR EDMOND JOHNSON | * | NO. 2022-C-0313 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| OCHSNER CLINIC | * | |
| FOUNDATION, ET AL. | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPLICATION FOR WRITS DIRECTED TO
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2009-01063, DIVISION "C"
Honorable Sidney H. Cates, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Judge Paula A. Brown, Judge Dale N. Atkins, Pro Tempore Judge Madeline Jasmine)

Don S. McKinney
Shelly S. Howat
Erica P. Sensenbrenner
ADAMS AND REESE LLP
701 Poydras Street, Suite 4500
New Orleans, LA 70139

      COUNSEL FOR RELATORS, OCHSNER CLINIC FOUNDATION AND
      DR. WILLIAM C. COLEMAN

Joseph S. Piacun
PIACUN LAW FIRM LLC
1340 Poydras Street, Suite 2100
New Orleans, LA 70112

William S. Vincent, Jr.
2018 Prytania Street
New Orleans, LA 70130

      COUNSEL FOR RESPONDENT, ARTHUR EDMOND JOHNSON

**WRIT GRANTED IN PART; JUDGMENT REVERSED IN PART; AND
WRIT DENIED IN PART
JULY 26, 2022**

This is a medical malpractice case. Relators, Ochsner Clinic Foundation and Dr. Coleman (hereinafter "Dr. Coleman"), seek review of the trial court's April 19, 2022 judgment, which denied their "Motion for Partial Summary Judgment and Motion to Exclude the Testimony of Dr. Marvin Mengel and Carol Vagnoni, RN, CDE," as well as their Peremptory Exception of Prescription, regarding the claims asserted by Respondent, Arthur Edmond Johnson (hereinafter "Mr. Johnson"). For the following reasons, we grant the writ in part; reverse the trial court's judgment in part; and deny the writ in part.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

*Treatment Received by Mr. Johnson*

According to the record, Mr. Johnson was diagnosed with diabetes in 1996. In April 2003, he sought treatment within the Ochsner Health System for "blistering" on his left foot and saw Dr. Coleman. Thereafter, Dr. Coleman referred Mr. Johnson to a surgeon, Dr. Farrell Johnson (hereinafter "Dr. Johnson"), who successfully treated the wound with antibiotics, topical medication, dry wraps, and glucose monitoring. On August 25, 2003, Mr. Johnson sought emergency treatment for a chemical burn on the toes of his left foot. Subsequently, on August

1

28, 2003, Dr. Johnson administered the same treatment as before to Mr. Johnson. However, the wound failed to heal due to poor circulation, and Mr. Johnson ultimately required a partial amputation below the knee of his left leg. A November 13, 2003 x-ray report revealed atherosclerotic calcifications in Mr. Johnson's hind foot. Shortly thereafter, the partial amputation "failed;" and Dr. Robert J. Treuting (hereinafter "Dr. Treuting") performed a second surgery and then referred Mr. Johnson to Dr. Julia Garcia-Diaz (hereinafter "Dr. Garcia-Diaz") for treatment of his infection. Mr. Johnson underwent hyperbaric treatments, which were successful, and by April 12, 2004, Dr. Treuting noted that Mr. Johnson's wound had healed substantially. Dr. Treuting discharged Mr. Johnson to return to work on an "as-needed basis" on June 17, 2004.

In January 2005, Mr. Johnson returned to Dr. Garcia-Diaz for further treatment for injuries to his left foot; and Dr. Garcia-Diaz subsequently referred Mr. Johnson to Dr. Coleman for "offloading."[1] Mr. Johnson's wounds appeared to be healing on April 25, 2005, on which date Dr. Coleman placed a "total contact cast"[2] on Mr. Johnson's foot; yet the wound did not heal, and it became larger by May 2, 2005. Through continuing treatments, the wound healed by May 29, 2006.

---

[1] "'Offloading' in diabetic foot management is a term generally understood as relieving pressure from an ulcerated area." Neil Baker & Isam S. Osman, *The Principles and Practicalities of Offloading Diabetic Foot Ulcers*, THE DIABETIC FOOT JOURNAL (Wounds Group, London, Eng.), Jan. 2016, at 172.

[2] The phrase "total contact cast" refers to "a rigid or semi-rigid molded cast which extends from the patient's foot to just below the knee, maintaining contact with the entire plantar surface of the foot and lower leg and immobilizing surrounding joints and soft tissue while allowing the patient to remain ambulatory." Grace Messenger, Richard Masoetsa & Imtiaz Hussain, *A Narrative Review of the Benefits and Risks of Total Contact Casts in the Management of Diabetic Foot Ulcers*, THE J. OF THE AM. C. OF CLINICAL WOUND SPECIALISTS (Am. Coll. of Clinical Wound Specialists, Athens, Tenn.), June 7, 2018, at 19-20.

Two weeks later, Mr. Johnson presented to Dr. Coleman with another blister on his left foot. Without further consultations or evaluations, Dr. Coleman drained and washed the blister and wrapped Mr. Johnson's foot in an "Unna boot."[3] On June 19, 2006, one week later, removal of the Unna boot revealed the development of a three-centimeter ulcer and that "the outer layer of the blister [had] separated from the deeper portion of the tissues and [had] become macerated." Dr. Coleman treated the wound and sent Mr. Johnson home with additional home-care instructions. Mr. Johnson returned on June 26, 2006, to Dr. Coleman, who treated the wound; "debrided the redundant tissue;"[4] and wrapped Mr. Johnson's foot in another Unna boot. On July 6 and 10, 2006, Mr. Johnson returned for the same treatments. On July 20, 2006, Dr. Coleman performed "deep debridement" and applied "padding and a [P]lastazote boot"[5] to Mr. Johnson's foot (rather than utilize another Unna boot).

---

[3] An "Unna boot is [a] compression therapy method" that "provides a semisolid mold acting as an effective compression device" with use of "non-elastic bandages [that exert] high pressure when the muscles are contracted (e.g. when walking) and small pressure at rest." Bruna Suelen Raymundo Luz, Cristina Souza Araujo, Dênia Amélia Novato Castelli Von Atzingen, Adriana Rodrigues dos Anjos Mendonça, Marcos Mesquita Filho & Mauricéia Lins de Medeiros, *Evaluating the Effectiveness of the Customized Unna Boot When Treating Patients with Venous Ulcers*, ANAIS BRASILEIROS DE DERMATOLOGIA (Brazilian Society of Dermatology, Rio de Janeiro, Braz.), Jan. - Feb. 2013, at 42.

[4] "[D]ebridement is a technique aimed at removing nonviable and necrotic tissue, thought to be detrimental to healing." Elizabeth Lebrun, Marjana Tomic-Canic & Robert S. Kirsner, *The role of surgical debridement in healing of diabetic foot ulcers*, WOUND REPAIR & REGENERATION (Wound Healing Soc'y & the European Tissue Repair Soc'y), Sept. 14, 2010.

[5] Plastazote is a type of material used in foot orthoses (braces) to "decreas[e] pressures under the diabetic foot." Olfat Mohamed, Kay Cerny, Loren Rojek, Krista Herbert, Rebecca Turner & Sean Waistell, *The Effects of Plastazote® and Aliplast®/Plastazote® Orthoses on Plantar Pressures in Elderly Persons With Diabetic Neuropathy*, JOURNAL OF PROSTHETICS & ORTHOTICS (Am. Acad. of Orthotists & Prosthetists, Falls Church, VA), April 2004, at 56.

By August 1, 2006, Mr. Johnson's foot ulcer had become gangrenous, and Dr. Coleman removed the toxic tissue. At some point, Mr. Johnson received a referral to Dr. Alva Roche-Green (hereinafter "Dr. Roche-Green") for blood sugar monitoring. Dr. Roche-Green resumed Mr. Johnson's treatment on August 8, 2006, and referred Mr. Johnson to a dietician for diet modification education. In September 2006, Mr. Johnson was "referred to infectious disease and to have an evaluation of his heart." On September 29, 2006, Dr. Coleman recommended a skin graft; but Mr. Johnson did not receive one. On October 11, 2006, Dr. Roche-Green examined Mr. Johnson and referred him that same day to a vascular doctor, Dr. Yung-Wei Chi (hereinafter "Dr. Chi"), for an "arterial peripheral evaluation." Dr. Chi diagnosed Mr. Johnson with "atherosclerosis, essential hypertension, uncontrolled peripheral circulation and hyperlipidemia," and noted that Mr. Johnson had "developed a left plantar ulcer after being placed in an [U]nna boot."

On November 10, 2006, Mr. Johnson presented to Dr. Christopher Babycos (hereinafter "Dr. Babycos") for a skin graft consultation. Instead of the skin graft, Dr. Babycos recommended debridement by an orthopedist due to bone exposure on Mr. Johnson's foot. Thereafter, Mr. Johnson received treatment from Dr. Garcia-Diaz, who diagnosed "new areas of necrotic tissue, peripheral vascular disease, diabetes, elevated creatine and decreased hemoglobin," and admitted Mr. Johnson to the hospital. Following an orthopedic consultation, Mr. Johnson underwent an amputation of his left leg below the knee; and he was discharged from the hospital on November 15, 2006.

***January 29, 2009 Petition for Damages***

On January 29, 2009, Mr. Johnson filed a Petition for Damages (hereinafter "Petition"),[6] in which he asserted that Dr. Coleman, breached the standard of care by unsuccessfully, yet continuously, treating a wound on his foot with the Unna boot. Mr. Johnson alleged that this course of treatment was inappropriate considering the severity of his diabetes, which Dr. Coleman allegedly failed to monitor. Further, Mr. Johnson contended that this ultimately resulted in the below-the-knee amputation of his left leg. Additionally, Mr. Johnson alleged in his Petition that Dr. Roche-Green, as well as Dr. Coleman, breached the standard of care by failing to monitor his blood sugar levels and failing to provide consultations with proper specialists, which thereby contributed to the deterioration of his foot wound and the ultimate amputation of his lower leg.

In the Petition, Mr. Johnson also named Ochsner[7] as a defendant and claimed that Ochsner was vicariously liable for the negligence of his care providers as Ochsner's employees. He further asserted a general negligence claim against Ochsner for negligent hiring/contracting, failure to monitor his blood sugar and diabetic care, and failure to provide consultations with specialists. Mr. Johnson alleged that all of this contributed to the deterioration of his foot wound and the ultimate amputation of his lower leg.

---

[6] Mr. Johnson initially filed a medical review panel complaint on June 28, 2007. *See* La. R.S. 40:1231.8.

[7] Plaintiff named Ochsner Clinic Foundation, Ochsner Clinic LLC, and Ochsner Hospital Management Services Corporation as individual defendants. However, throughout the case, it appears that all three defendants have been collectively referred to as "Ochsner," and will be herein as well.

***Expert Witnesses***

During the course of the proceedings, Mr. Johnson eventually named Dr. Marvin Mengel (hereinafter "Dr. Mengel"), an endocrinologist, and Carol Vagnoni (hereinafter "Ms. Vagnoni"), a registered nurse and certified diabetes educator, as two of the witnesses that would provide his expert medical testimony. In response, Relators filed on October 1, 2020, a motion to strike the two witnesses, which the trial court denied on October 22, 2020. Dr. Mengel and Ms. Vagnoni were deposed on April 23, 2021, and June 1, 2021, respectively.

***Ms. Vagnoni's June 1, 2021 Deposition***

In her deposition, Ms. Vagnoni opined that there was a "system wide failure by Ochsner" to meet the standard for Mr. Johnson's diabetic care and that Mr. Johnson "should have received the required diabetes education. That was not provided when he needed it. It should have been recognized." When asked who specifically had a duty to provide that education and when, Ms. Vagnoni indicated that "through the course of the entire time of his care[,]" there was a duty to provide diabetic education. It was her express opinion that at Mr. Johnson's initial visit with Dr. Roche-Green in 2003, a referral for diabetes education could have been made. Ms. Vagnoni also indicated that a referral should have been made when Dr. Coleman was treating Mr. Johnson. While Ms. Vagnoni stated that "[a]ny of the health care providers" should have recognized the need for diabetes education and should have made a referral, Ms. Vagnoni explicitly named instances with Drs. Roche-Green and Coleman in which, in her opinion, Mr. Johnson's health care team breached the standard of care. Notably, Ms. Vagnoni admitted that only physicians can order diabetic education; and she suggested that any or all of Mr. Johnson's physicians could have and should have ordered it.

***January 14, 2022 "Motion for Partial Summary Judgment and Motion to Exclude the Testimony of Dr. Marvin Mengel and Carol Vagnoni, RN, CDE" and Peremptory Exception of Prescription***

On January 14, 2022, Relators filed a "Motion for Partial Summary Judgment and Motion to Exclude the Testimony of Dr. Marvin Mengel and Carol Vagnoni, RN, CDE." Therein, they asserted that neither Dr. Mengel nor Ms. Vagnoni planned to testify that Dr. Coleman's application of the Unna boot caused Mr. Johnson's injury; that Ms. Vagnoni was statutorily prohibited from testifying as to the standard of care for a physician; and that Mr. Johnson had not provided factual support for his general, individual negligence claims against Ochsner. Also on January 14, 2022, Relators filed a Peremptory Exception of Prescription against any potential new claims Mr. Johnson may assert against (1) an unidentified infectious disease physician; or (2) any defendant for the failure to provide diabetic education.

***Mr. Johnson's March 23, 2022 Memorandum in Opposition***

On March 23, 2022, Mr. Johnson filed a "Memorandum in Opposition to Motion for Partial Summary Judgment and Motion to Exclude the Testimony of Dr. Marvin Mengel and Carol Vagnoni, RN, DCE" (hereinafter "Memorandum in Opposition"). In his Memorandum in Opposition, Mr. Johnson argued that because the care of a diabetic patient transcends multiple medical specialties, Dr. Mengel, as an endocrinologist, and Ms. Vagnoni, as a nurse and certified diabetic educator, were both "qualified by education, training, and experience to render opinion testimony on this case against all remaining Ochsner defendants, including Dr. Coleman." Mr. Johnson further argued that Ochsner would be vicariously liable for any negligence committed by its employee health care providers and should not be

7

dismissed from the case. He did not address the alleged absence of support for an individual negligence claim against Ochsner.

*April 8, 2022 Hearing*

At an April 8, 2022 hearing, the trial court orally denied Relators' "Motion for Partial Summary Judgment and Motion to Exclude the Testimony of Dr. Marvin Mengel and Carol Vagnoni, RN, CDE." The trial court stated that "I think [Ms. Vagnoni] is offering testimony against Ochsner, so I [do not] know that [she has] offered testimony against an individual physician." The trial court further explained, "I think [they are] qualified, and [I am] going to let them testify regarding the mismanagement of [Mr. Johnson]'s diabetes as a whole." At the hearing, the trial court also orally denied the Peremptory Exception of Prescription.

*April 19, 2022 Judgment*

On April 19, 2022, the trial court signed a judgment denying Relators' "Motion for Partial Summary Judgment and Motion to Exclude the Testimony of Dr. Marvin Mengel and Carol Vagnoni, RN, CDE" and the Peremptory Exception of Prescription. Relators filed a notice of intent on April 18, 2022, and the trial court set a return date of May 9, 2022, on which date Relators timely filed their writ application in this Court.

In their writ application, Relators assert, in pertinent part, that the trial court erred by denying their "Motion for Partial Summary Judgment and Motion to Exclude the Testimony of Dr. Marvin Mengel and Carol Vagnoni, RN, CDE." In particular, they contend that to allow Ms. Vagnoni to testify in this matter would contravene La. R.S. 9:2794(D) because she is a nurse, not a physician. Additionally, they argue that "[b]ecause Ms. Vagnoni's criticism in this matter is the alleged failure of [Mr. Johnson]'s physicians to order diabetes education with a

8

certified diabetes educator, she is not, by law, qualified to serve as an expert in this matter." We grant Relators' writ application for the purpose of reviewing that portion of the trial court's April 19, 2022 judgment pertaining to Ms. Vagnoni.

## STANDARD OF REVIEW

A trial court has broad discretion in the determination of whether expert testimony is admissible, as well as in the determination of whether someone is "permitted to testify as an expert." *Johnson v. Morehouse Gen. Hosp.*, 2010-0387, 2010-0488, p. 17 (La. 5/10/11), 63 So.3d 87, 99 (citing *Cheairs v. State ex rel. Dep't of Transp. & Dev.*, 2003-0680, p. 6 (La. 12/3/03), 861 So.2d 536, 541). An appellate court does not overturn these decisions unless the trial court abused its broad discretion. *Id.*

## DISCUSSION

Louisiana Revised Statutes 9:2794(D)(1) sets forth the qualifications required to be deemed a physician expert witness and provides, in pertinent part, that "[i]n a medical malpractice action against a physician . . . a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care *only if the person is a physician* who meets [certain listed] criteria . . . ." (Emphasis added). In the matter *sub judice*, Ms. Vagnoni is a registered nurse with an associate degree, and she is a certified diabetes educator. She is not a physician, which is a requirement for providing expert testimony against a physician in a medical malpractice case. Consequently, per La. R.S. 9:2794(D)(1), Ms. Vagnoni is precluded from testifying as to the standard of care for a physician or regarding a breach of the standard of care. As noted, during her deposition, Ms. Vagnoni testified that only physicians can order diabetic education, and she suggested that any or all of Mr. Johnson's physicians could have and

9

should have ordered it. In light of this admission, Ms. Vagnoni clearly offered her opinion that the duty to order diabetes education falls under the standard of care applicable to a physician, and specifically that it fell under the standard of care applicable to all of Mr. Johnson's physicians. Further, her testimony that Mr. Johnson's physicians "should have" ordered diabetic education indicates that (1) none of the physicians did, and (2) in failing to do so, they all breached the standard of care.

The trial court concluded that Ms. Vagnoni was providing expert testimony against Ochsner in general. However, a thorough review of Ms. Vagnoni's deposition and Mr. Johnson's Memorandum in Opposition demonstrates otherwise.[8] Ms. Vagnoni did not offer testimony as to the standard of care applicable to Ochsner as an institution; the standard of care applicable to Ochsner's nurses; or the standard of care of any certified diabetes educators employed by Ochsner. Moreover, she did not opine that Ochsner's diabetic education program was substandard. In fact, she admitted that she had never been to any Ochsner facility and had no information regarding Ochsner's diabetes educators dating back to the start of Mr. Johnson's care at Ochsner. Additionally, Ms. Vagnoni admitted that she was unqualified to testify as to the standard of care for a physician and stated, "I know the standard of care for diabetes education and where that plays a role in helping an individual with diabetes." Similarly, she admitted that she had not maintained her hospital nursing skills (having "left the floors") and that her

_____

[8] In Mr. Johnson's Memorandum in Opposition, as well as his response to the instant writ application, he acknowledges that he intended for Ms. Vagnoni to "testify regarding the allegations of medical malpractice against Ochsner and its doctors," and as to "whether Ochsner physicians properly monitored [his] diabetes."

expertise was in diabetic education. Thus, Ms. Vagnoni was qualified only to testify as to whether Ochsner's diabetic education program met the standard of care for diabetic education programs, yet nothing in her deposition pertained to this issue.

As set forth, nothing in Ms. Vagnoni's deposition indicated that she intended to testify against Ochsner (or a "system wide failure") outside of her criticism of Mr. Johnson's individual physicians, and none of the opinions she offered fell within the scope of her expertise. Ms. Vagnoni's sole opinion in this case is that any or all of Mr. Johnson's physicians breached their standard of care by failing to timely refer him to a certified diabetic educator. In that she is not statutorily qualified to testify as to the standard of care for a physician, pursuant to La. R.S. 9:2794(D), she should have been excluded as an expert witness. Thus, the trial court abused its discretion in determining that Ms. Vagnoni was qualified to provide expert testimony outside of her expertise.

### DECREE

For the foregoing reasons, we grant the writ in part and reverse the portion of the trial court's April 19, 2022 judgment that denied Relators' Motion to Exclude Ms. Vagnoni as an expert witness in this case. We deny the writ application as to all remaining claims.

**WRIT GRANTED IN PART; JUDGMENT REVERSED IN PART; AND WRIT DENIED IN PART**

11